Argued and submitted January 11, judgment of conviction and sentence of death affirmed March 25, reconsideration denied July 28, 2011

STATE OF OREGON,
*Respondent,*

*v.*

JASON VAN BRUMWELL,
*Appellant.*

(CC 04C46225; SC S054854)

249 P3d 965

Joseph C. Guimond, Judge.

Shawn E. Wiley, Chief Deputy Public Defender, Salem, argued the cause and filed the brief for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Ryan Kahn, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With him on the brief were John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, Timothy A. Sylwester, Douglas F. Zier, Jamie Contreras, and Erika L. Hadlock.

KISTLER, J.

**KISTLER, J.**

This case is before us on automatic and direct review of defendant's judgment of conviction and sentence of death. On review, defendant assigns error to 33 of the trial court's rulings. For the reasons set out below, we affirm the judgment of conviction and sentence of death.

In 1996, defendant was sentenced to life imprisonment without the possibility of parole for the aggravated murder of one person and the attempted aggravated murder of another. The aggravated murder and attempted aggravated murder occurred during the robbery of a Dari Mart, a convenience store in Eugene. In 2004, while serving that sentence at the Oregon State Penitentiary, defendant and another inmate, Gary Haugen, killed a third inmate. A grand jury indicted defendant and Haugen for aggravated murder,[1] and a jury found both defendants guilty of that crime after a joint guilt-phase trial. The facts relating to the inmate's murder and the joint guilt phase of defendant's trial are set out in *State v. Haugen*, 349 Or 174, 243 P3d 31 (2010). Because the only issues that we discuss in this opinion concern the penalty phase of defendant's trial, we do not restate those facts here.

The trial court held separate penalty-phase hearings for defendant and Haugen. Much of the evidence at defendant's penalty-phase hearing focused on the aggravated murder and attempted aggravated murder that occurred during the Dari Mart robbery, and defendant's primary assignments of error on review focus on the admission of evidence regarding satanism and death metal music that led up to those crimes. To put defendant's arguments in perspective, we recount that evidence briefly.

In 1994, defendant was 18 years old. He had dropped out of North Eugene High School and was working, off and on, at a local Goodwill—a job that his mother had helped him get after telling him that he needed to go back to school, get a

---

[1] The state charged defendant with two counts of aggravated murder: intentional murder committed after having been convicted previously of murder, ORS 163.095(1)(c), and intentional murder committed while confined in a state correctional facility, ORS 163.095(2)(b).

job, or leave home. Defendant's day-to-day life revolved around his friends. Defendant and three of his friends formed what one of them described as "just kind of a garage-band-type thing. Nothing real serious." The four of them would hang out at defendant's parents' house—smoking pot, playing music, writing songs, and listening to music.

The group was interested primarily in death metal music, although its members also had some interest in heavy metal and jazz. In explaining the difference between death metal and heavy metal, one member of the group testified that "death metal music would be considered heavier—heavier distortion, guttural vocals, lyrics that would be more—generally, it would be violent lyrics towards other people or—or satanic as a general—general idea of what the lyrics would be about."[2] One of the group's favorite death-metal bands was Deicide, and each member of the group had his own copy of Deicide's eponymous debut album *Deicide*. That album contains a series of songs that focus on violence and satanic ritual; among other things, the songs mimic traditional Christian rituals, replacing references to Christian symbols and images with satanic or demonic ones.[3]

When asked whether the group referred to themselves in 1994 as satanists, one member of the group said, "Yeah, I believe we—we would refer to ourselves as that." When asked what it meant to be a satanist, he replied that he "d[idn't] know exactly what it meant to me then [when the Dari Mart murder occurred] because I was—I was quite young." He explained:

> "I think it was just a lot of anger, and I—and I related to—I related to the—to the music and the lyrics and the anger and all of that stuff, and for some reason I called that satanism, the rebelling against my parents and peers and the people that I felt had hurt me * * *."

---

[2] Another member of the group testified that death metal lyrics tended to be "gloom[ier]." As he explained, "[t]hey could range from—anything from cannibalism to mutilation to murder to the end of the world to—you know, it just runs the gamut * * *."

[3] The trial court admitted a compact disc of *Deicide* into evidence during the penalty phase of defendant's trial. The liner notes for *Deicide* contain the lyrics of the songs on the album and also depict a satanic symbol that defendant and his friends discussed painting on the wall of the Dari Mart.

One of defendant's friends did not think that defendant personally was a satanist. According to that witness, defendant "didn't really have any beliefs as in—such as like I'm a satanist or a God worshipper, or anything like that." The witness acknowledged that there may have been "symbolisms and stuff like that," but he explained that "there was nothing satanism really about [defendant]," except when he and another friend, Mike Hayward, were together. Consistent with the witness's testimony that there may have been "symbolisms and stuff like that," the state elicited evidence that defendant had used a hot knife blade to burn an image of an inverted cross on his body. An inverted cross is a satanic symbol, which can be found depicted in the liner notes of *Deicide*.

On April 10, 1994, defendant and the three other band members got together at defendant's house around noon. They smoked some marijuana, put on some music, and "[got] the guitars out." When their marijuana ran out, they began thinking of ways to get money so that they could buy more marijuana and "hopefully, some musical instruments, or something, to—for the band." Someone suggested "a robbery at an ATM sort of like a—some type of mugging, or something," but the group "decided that wasn't something we were going to do[.]" Then they thought of robbing a store, and defendant suggested a convenience store, the Dari Mart, as an "isolated, you know, out-of-the-way spot" that would be easy to rob. The four of them took a trip to the store that afternoon to check out the store's security system and returned to defendant's house to "brainstor[m] * * * the easiest and best way to do it[.]" They discussed, for example, whether it would be better to shut off the security system or tie the employees up. At that point, there was no discussion of either weapons or murder.

One member of the group left to go to work, and the remaining three members (defendant, Brock, and Rabago) went over to the house of one of defendant's other friends, Mike Hayward. After they met with Hayward, the four of them went to Rabago's house where they picked up weapons—metal bars, a slag hammer, and a knife. From there, they returned to defendant's house where they continued to plan the robbery. At some point, they decided that they were going to kill "just anyone at the store * * * because we

didn't want any witnesses left." As they were planning the robbery and murder, they talked about "leav[ing] some kind of satanic graffiti on the wall" of the Dari Mart. Specifically, they discussed spray-painting the "trifixion," a symbol depicted in the liner notes of *Deicide*, on the Dari Mart wall.[4] At defendant's penalty-phase hearing, Rabago acknowledged that he previously had testified "that [they] did this, in refer-ring to the [Dari Mart] murder, in the essence of Glen Benton and Chris Barnes."[5] Glen Benton is the bass player and vocal-ist for Deicide and the person who, according to the liner notes for *Deicide*, designed the trifixion that the group con-sidered painting on the Dari Mart wall.[6]

The group never carried out their idea of painting the trifixion on the wall of the Dari Mart. They did, however, go forward with the rest of their plan. That evening, defen-dant, Hayward, Rabago, and Brock returned to the Dari Mart one more time to check out the store. This time, Hayward bought cigarettes from one of the clerks, who carded him. Then, they went back to defendant's house where they con-tinued to talk about robbery and murder. Around nine that evening, the four men returned to the Dari Mart and parked in a nearby church parking lot, where they sat in their car lis-tening to *Deicide* and waiting until shortly before the Dari Mart closed at eleven. At defendant's penalty-phase hearing, Brock reaffirmed his earlier testimony "that the music [on the *Deicide* album] was significant in relation to this killing." As he explained, "[w]e related to the—to the lyrics of the music, the subject such as murder that it [Deicide] discussed in the lyrics, the—the subject of mutilation and that type of thing."[7]

---

[4] Although Brock referred to the trifixion as "a symbol on a Deicide album," the trifixion is depicted in the liner notes for *Deicide*. The trifixion is composed of three inverted crosses connected by a series of lines that form two pentagrams.

[5] Brock and Rabago had testified in an earlier trial regarding the Dari Mart murder, and the prosecutor sometimes refreshed their memory with their earlier testimony.

[6] Chris Barnes was an "ex-member vocalist for the band Cannibal Corpse," another of the group's favorite death metal bands.

[7] Rabago's testimony differed from Brock's. Rabago initially agreed on cross-examination that "[t]his music wasn't something that was any kind of motive regarding the Dari Mart incident." When asked on redirect whether "the music and the beliefs that you [referring to the four men] held had nothing to do with leading you to [the murder]," Rabago testified, "The beliefs, possibly. But the music was

Shortly before the Dari Mart closed at eleven, defendant, Hayward, Brock, and Rabago went into the store. Two women were working in the store.[8] One woman was stocking the walk-in cooler in the back while the other was at the front of the store. Hayward smiled at the woman at the front of the store and waved to her as he walked by. (She was the person who had carded him earlier that day when he bought cigarettes.) Hayward went to the back of the store, and Brock followed him. The two of them went into the walk-in cooler where the other woman was working. She looked at Hayward and Brock for about 10 to 15 seconds. No one said anything. As Brock later testified, the woman "kind of turned her back towards us and that's when [Hayward] struck her with the metal bar that he had." She "kind of stumbled." Hayward hit her again, and "she kind of fell." "[H]e struck her a few more times * * *." At that point, Brock left, went outside, and sat in the car. As he explained, "it just—it all kind of got surreal almost."

The pathologist who examined the woman's body testified that there were "12 to 15 different impacts to the head," resulting in multiple fractures of her skull. At one point, her skull "was actually caved in." There were also defensive wounds to her hands, showing that she had not died immediately. The pathologist concluded that:

> "[t]he cause of death was—were the head injuries, skull fractures with brain contusions, which are bruises, and also lacerations, which are tears of the brain."

Defendant and Rabago stayed at the front of the store, where the other woman was working behind the counter. She testified that, as she heard the walk-in cooler door open, defendant "ran towards me with a metal bar over his head and like growled at me. And then, when he got up to me, he told me that he was just kidding." The clerk testified during the penalty phase that, after the robbery, she listened to death metal music, and the growl that defendant emitted

actually a catharsis * * * [for] pent-up aggression and anger and—and pain." When asked whether the beliefs that had helped lead to the murder were beliefs in satanism, Rabago answered, "I personally had a belief in satanism, yes." Rabago also agreed that "[defendant] had expressed those [beliefs] also to [him] at [that] time."

[8] One woman was 28 years old at the time of the robbery; the record does not disclose the other woman's age.

as he ran towards her was similar to the guttural vocals she heard on the death metal album.

Defendant took the money from the cash register, about $40, and then went back to the cooler while Rabago stayed at the front of the store with the young woman. After a couple of minutes, defendant came back to the front of the store. Hayward was behind him. Defendant told the clerk that they were not going to hurt her, that they wanted her to go to the back of the store with them, and that they were just going to tie her up. The clerk, however, noticed blood sprayed on Hayward's face and "realized that maybe that it might be more than a robbery." As they took her to the back of the store, defendant was carrying "a metal piece of rebar," while Hayward had "a longer piece of metal bar."

When they got to the back of the store, Hayward told defendant to hit the clerk. As the clerk testified,

> "[Defendant] started beating me over the head, and I fell against this back door here [pointing to a map]. And I kept getting back up, and he continued to beat me * * * [o]ver my head and my arms. I was trying to protect my head. And they hit my legs, and stuff like that."

After defendant "had done it for a while," he began saying over and over "die, bitch, die." Initially, only defendant was hitting the young woman. Then, "the other guys came around and they started kicking and beating [her] as well." At one point, she heard Hayward say to defendant, "I killed mine. Why can't you kill yours?" Later, as she was lying on the floor, the clerk heard defendant tell Rabago to get a knife. As she later testified, "And I—I was stabbed, but I never did see a knife."

Hayward and Rabago left. Defendant paused, and the clerk "got enough strength to get up" and try to run for safety to a nearby bathroom, where she could lock herself in. As she explained, "I had just like seconds [to get away. But a]s soon as I ran past [defendant], he was right there with me." He said, "Oh, no, you don't. And he pushed the door, and I didn't have as much strength as I did because he had crushed my arms with the rebar."

The clerk "fell back onto the toilet, where [defendant] continued to beat [her] over the head." She testified that, "at this point in time, I guess I had lost so much blood that I just kind of—I had to keep laying my hands in my lap because they were—I couldn't hold them up anymore." She heard defendant ask, "Just why won't you die, bitch?" And then,

> "[defendant] decided to take the bar and shove it into my mouth like he was going to, like, shove it out the back of my neck.[9] And so, I tried to hold onto it. And he continued doing that and then he knocked my teeth out and then continued beating me again."

At that point, the front door buzzer sounded. A customer had come into the store just before closing time to buy some sour cream, tripping the buzzer as he opened the door. Defendant stopped and looked towards the front of the store, as if he were trying to see if someone had come in. In that moment, the clerk shut the bathroom door, threw her weight against it, and managed to get the hook through the latch on the door.

The customer found the sour cream and was waiting at the counter to pay. As he later testified, he could not say how long he waited. He was not keeping track of time. Then, he noticed two men walking toward the front door. One of them was "carrying a knife and covered with blood up to his elbow." The two men did not make eye contact with the customer but walked by "[w]ith purpose. Pretty much [in] a hurry." On realizing the significance of what he had seen, the customer "bolted for home and called 9-1-1."

The clerk survived. When the ambulance brought her to the emergency room, she was in shock, having lost 40 percent of her blood. Of most concern to the doctor who treated her was the profuse bleeding from her scalp. He testified that "there were multiple extensive gaping lacerations" in her scalp. The bone underneath her scalp was exposed, and there were other areas where the scalp "was loose on the—on top of the bone of the skull." Additionally, she had

---

[9] Defendant later told one of his friends that he "turn[ed] the bar to try and stab her in the mouth."

broken teeth, fractured arms, and multiple stab wounds on her arms and scalp and through her hand. The doctor who provided medical care for the clerk had spent part of his career as a trauma doctor in an emergency room in Baltimore, where he had had extensive experience treating life-threatening injuries. When asked whether he had ever seen such a beating, the doctor replied, "I have never seen such a severe beating, no, in all of my years of trauma call."

In addition to that evidence, the jury heard evidence regarding the difficulties defendant had faced growing up, his disciplinary record in prison, and the character witnesses from prison whom defendant called on his behalf. The jury also had before it evidence regarding defendant and Haugen's murder of the inmate from the guilt phase of defendant's trial, as well as defendant's allocution to the jury. After considering that evidence, the jury sentenced defendant to death.

On review, defendant assigns error to 33 rulings that the trial court made during the guilt and penalty phases of his trial. Our decision in *Haugen*, 349 Or at 180-95, answers many of the guilt-phase assignments of error that defendant raises in this case, and we write to address two of defendant's assignments of error and part of a third assignment of error that challenge the trial court's rulings regarding the penalty phase of defendant's trial.[10]

Defendant's first and second assignments of error are directed at the trial court's rulings admitting evidence of satanism and death metal music during the penalty phase of his trial. Before the penalty phase began, defendant filed two motions *in limine*. One challenged the admission of any evidence regarding satanism; the other, the admission of any evidence regarding death metal music. In response, the state noted that, in *State v. Hayward*, 327 Or 397, 406-09, 963 P2d 667 (1998), this court had held that evidence of satanism and death metal music was admissible to prove Hayward's

---

[10] We have considered each of defendant's other assignments of error and each of his supporting arguments. Those other assignments of error either have been discussed by this court in previous cases and resolved against defendant, were not preserved for review, or are not well-taken. Further discussion of the issues would not benefit defendant, the public, the bench, or the bar.

motive for the Dari Mart crimes. Relying on *Hayward*, the trial court denied defendant's motions *in limine*. During the penalty phase, each time that the state offered evidence regarding satanism or death metal music, defendant objected for the reasons set out in his motions *in limine*, and the trial court overruled his objections.

On review, defendant reiterates the arguments that he made in his motions *in limine*. He contends that the evidence was not relevant to any penalty-phase issue; that even if the evidence were relevant, its prejudicial effect substantially outweighed its probative value; and that the admission of that evidence violated his state and federal rights to freedom of religion and expression.

We begin with defendant's argument that evidence that he identified with satanism and preferred death metal music was not relevant to any issue that the jury had to decide in the penalty phase. More specifically, defendant reasons that his religious affiliation and musical preference, without more, do not prove that he is likely to be dangerous in the future (the issue that the second death penalty question poses), nor do they constitute, he contends, "aggravating evidence" that the jury may consider in deciding whether to impose the death penalty (the issue that the fourth death penalty question poses). Defendant argues that his identification with satanism and his preference for death metal music would be relevant only if the state introduced evidence from which the jury could find that satanists or death metal fans either advocate or commit violent acts.

After the parties present evidence during the penalty phase of an aggravated murder trial, the jury has to answer four questions: (1) whether the defendant deliberately committed the murder; (2) whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"; (3) whether, if presented by the evidence, the murder was an unreasonable response to any provocation by the deceased; and (4) "[w]hether the defendant should receive a death sentence." ORS 163.150(1)(b). The jury is instructed to answer

the fourth question "no" if, "after considering any aggravating evidence and any mitigating evidence, * * * any circumstances of the offense and any victim impact evidence * * *, one or more of the jurors believe that the defendant should not receive a death sentence." ORS 163.150(1)(c)(B).

Evidence is relevant and thus admissible in the penalty phase if the evidence increases or decreases, even slightly, the probability of the existence of facts material to those penalty-phase questions. *See* OEC 401; *State v. Cox*, 337 Or 477, 485, 98 P3d 1103 (2004).[11] This court has long recognized that a defendant's prior criminal acts are relevant to the second question that the jury must decide in the penalty phase—whether the defendant will commit criminal acts of violence that constitute a continuing threat to society. *State v. Fanus*, 336 Or 63, 89, 79 P3d 847 (2003), *cert den*, 541 US 1075 (2004); *State v. Moore*, 324 Or 396, 417, 927 P2d 1073 (1996); *State v. Moen*, 309 Or 45, 73, 786 P2d 111 (1990). Evidence that, in 1994, defendant aided and assisted in the murder of one person and personally attempted to murder another was relevant to the jury's determination of his future dangerousness. The jury also could consider those past violent acts as "aggravating evidence" that it weighed along with mitigating evidence in deciding whether, as the fourth question asks, death is the appropriate penalty.

Defendant does not dispute that evidence that he committed the Dari Mart crimes was relevant to the issues that the jury had to decide in the penalty phase. He also acknowledges that this court held in *Hayward* that "death metal music and satanism provided at least one of the motives for [Hayward], Rabago, [defendant], and * * * Brock when they planned and committed the Dari Mart crimes." *Hayward*, 327 Or at 407. He argues, however, that evidence of death metal music and satanism was not relevant in this case for two reasons. He argues initially that, even though the evidence in *Hayward* was sufficient to establish that the group's interest in satanism and death metal music was one

---

[11] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

of the motives for the Dari Mart crimes, the evidence in this case differs. Defendant contends that the evidence in this case was not sufficient to establish a connection between his interest in satanism and death metal music and the commission of the Dari Mart crimes. He argues alternatively that, even if there were sufficient evidence in this case to permit the jury to find that his interest in satanism and death metal music was one of the motives for the commission of the Dari Mart crimes, his motives for committing those crimes were relevant only to the question of guilt or innocence. In defendant's view, his motives were not relevant to the sentencing issues that the jury had to decide in the penalty phase.

We begin with defendant's argument that there was no evidence in this record connecting satanism and death metal music to the commission of the Dari Mart crimes.[12] On that issue, the state introduced evidence during defendant's penalty-phase hearing that Deicide was one of defendant, Rabago, and Brock's favorite bands, that each of them had a copy of *Deicide*, that the lyrics of *Deicide* extolled satanism and violence, that the group planned on painting a satanic symbol from *Deicide* on the wall of the Dari Mart, that the group carried out the murder and attempted murder at the Dari Mart "in the essence of" or in homage to Glen Benton (the bass player and vocalist for Deicide who designed the satanic symbol the group considered painting on the Dari Mart wall), that the group listened to *Deicide* for almost two hours as they sat in the church parking lot waiting to commit the Dari Mart crimes, that the music and lyrics of those songs were "significant in relation" to the murder and attempted murder that the group committed immediately afterwards at the Dari Mart, and that defendant emitted a death metal growl as he ran towards the store clerk with a metal bar

---

[12] As the parties brief this issue, it presents a question of conditional relevancy. *See State v. McNeely*, 330 Or 457, 462 n 5, 8 P3d 212 (2000) (explaining that "[c]onditional relevancy means a situation where one fact is relevant only if another fact is proven"); OEC 104(2) (authorizing the admission of such evidence). That is, both parties assume that evidence that defendant identified with satanism or preferred death metal music, standing alone, would not be relevant to either the second or the fourth penalty-phase questions. The issue, as the parties brief it, is whether other evidence in the record makes that evidence relevant. *See Moore*, 324 Or at 418-19 (explaining that evidence that defendant had acted on his beliefs made the existence of those beliefs relevant to the penalty-phase issues in an aggravated murder trial).

raised over his head. Contrary to defendant's argument, there was evidence from which a reasonable juror could find that defendant's (and the group's) interest in satanism and death metal music was not merely coincidental with the crimes that occurred at the Dari Mart; rather, a reasonable juror could find, as this court held in *Hayward*, that defendant's (and the group's) interest in those subjects provided one of the motives for the crimes committed that night.

Defendant argues alternatively that his motives for committing the crimes at the Dari Mart were not relevant to the issues that the jury had to decide in the penalty phase. We reach a different conclusion, for at least three reasons. First, the reasons why defendant committed acts of violence that night at the Dari Mart bear on whether he is likely to commit similar acts in the future; that is, the specific triggers for violence that resulted in the Dari Mart crimes may or may not persist and their existence (or nonexistence) bears on his future dangerousness. Second, the reasons why defendant participated in one murder and attempted to commit another bear on his culpability for those acts, which in turn is relevant to the weight that the jury gives those acts as it considers the aggravating and mitigating evidence in deciding the fourth question—whether death is the appropriate penalty. Third, beyond the specific triggers for defendant's participation in one murder and his attempt to commit another, the jury could find that the reason why defendant committed those crimes says something more fundamental about his character. A person who participates in one murder and personally attempts to commit another as a way of paying homage to the bass player and vocalist in a band either places an exceedingly small value on human life or lacks empathy for others in a way that makes that person dangerous in the future, or so the jury could find.[13] In sum, the trial court correctly ruled that evidence regarding defendant's interest in

[13] Defendant argues finally that, because the evidence did not show that he has any current interest in satanism, evidence that he previously had such an interest is not relevant to his future dangerousness. Defendant's argument misses the mark. If his interest in satanism was one of the reasons for the violent acts that he committed at the Dari Mart, then the absence of such an interest reduces the likelihood that he will commit violent acts in the future. Additionally, the other two reasons why evidence of his motives was relevant—that the evidence bore on his culpability for those acts and that the jury could find that it said something more

satanism and death metal music was relevant to the issues in the penalty phase.

Defendant argues alternatively that, even if evidence regarding satanism and death metal music had some minimal relevance, the prejudicial effect of that evidence substantially outweighed its probative value. *See* OEC 403; *Hayward*, 327 Or at 407-08 (considering that issue).[14] We review the trial court's ruling on that issue for abuse of discretion. *Hayward*, 327 Or at 407; *Moore*, 324 Or at 407. We are aware, as the trial court was, that evidence regarding satanism could prejudice the jury in ways that were unrelated to the reason for its admission. We note, however, that any potential prejudice was tempered somewhat by the witnesses' testimony that the group and defendant's interest in satanism was more a way of expressing anger and disaffection from society than the adoption of any particular creed. Beyond that, evidence regarding satanism and death metal music was integrally related to the murder and attempted murder at the Dari Mart and, as explained above, was relevant to the jury's resolution of the second and fourth questions in the penalty phase. This court concluded in *Hayward* that, in this context, the "evidence to which [Hayward] object[ed] was not unfairly prejudicial. The trial court did not abuse its discretion in overruling [Hayward's] motion to exclude the evidence on that ground." 327 Or at 408. That conclusion applies equally here.

Defendant argues that, even if the evidence was relevant and not unfairly prejudicial, admitting evidence regarding satanism violated his right to freedom of religion under the state constitution. He also argues that admitting evidence regarding satanism and death metal music violated

_____

fundamental about his character—apply without regard to whether defendant still identifies with satanism.

[14] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

The state assumes that OEC 403 applies to this evidence, and so do we. We express no opinion on the application, if any, of OEC 404(4) in this context.

his rights to freedom of religion and association under the First Amendment.[15]

We begin with defendant's state constitutional claim.[16] In analyzing freedom of religion claims under the state constitution, the court has distinguished between applying neutral rules to religiously motivated conduct and rules that expressly target religion. *Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 368-72, 723 P2d 298 (1986). This court has explained that, when faced with a challenge to the application of a general rule that was "neutral toward religion on its face and in its policy" to religiously motivated conduct, the only issues were the "statutory authority to make such a regulation * * * and an individual claim to exemption on religious grounds." *Id.* at 368-69. Conversely, when religious activity "is the specific target of th[e] law," the state constitutional inquiry is more exacting. *Id.* at 369, 372 (explaining that a statute that expressly restricted public school teachers from wearing religious dress in the classroom would be justified if the "religious dress necessarily contravenes the wearer's role or function at the time and place beyond any realistic means of accommodation").

In this case, defendant challenges the trial court's ruling admitting evidence of satanism to prove his motive for committing the Dari Mart crimes. As we understand the trial court's ruling, the trial court concluded that evidence of defendant's motive was admissible without regard to whether the motive for participating in the Dari Mart crimes was pecuniary, religious, or otherwise. The fact that the evidence bore on defendant's motive for committing those crimes was the reason for its admission. Put differently, the

---

[15] Although defendant refers to his First Amendment right to listen to death metal music as a right of association, it seems more akin to a person's right to read, listen to, or view expressive activity.

[16] Defendant asserts that Article I, sections 2 and 3, of the Oregon Constitution extend protection to nontraditional religious beliefs as well as traditional ones. The state does not challenge that proposition, and we assume, for the purpose of analyzing defendant's state constitutional challenge, that Article I, section 3, extends protection to nontraditional religious practices, such as satanism. *See* Or Const, Art I, § 3 (providing that "[n]o law shall * * * interfere with the rights of conscience"); *cf. Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 371, 723 P2d 298 (1986) (describing Oregon's various religion provisions as "specifications of a larger vision of freedom for a diversity of religious beliefs and modes of worship * * *").

trial court applied a neutral rule of evidence—that evidence of motive is generally admissible—to what we assume was religiously motivated conduct. As such, *Cooper* teaches that the trial court's ruling was subject to attack only on the ground that the trial court lacked authority to make the ruling or on the ground that defendant was entitled to "an individual claim to exemption on religious grounds." *See id.* at 368-69.

Defendant does not contend that the trial court lacked authority to admit evidence of motive, nor does he argue for "an individual claim to exemption on religious grounds." That is, defendant does not argue that we should craft an exception for religiously motivated crimes from the neutral rule that evidence of a defendant's motives for committing crimes is generally relevant and admissible. Rather, defendant's argument assumes that the evidence was admitted only to prove that he was an adherent of a disfavored religion, and he argues that evidence admitted for that purpose infringes the free exercise of his religious beliefs. The difficulty with defendant's argument is the assumption that underlies it. As explained above, the trial court admitted the challenged evidence because it bore on defendant's motive for the Dari Mart crimes, without regard to the specific nature of the motive. Given the trial court's religion-neutral ruling, defendant's state constitutional argument fails. *Cf. State v. Plowman*, 314 Or 157, 165-66, 838 P2d 558 (1992) (upholding, against an Article I, section 8, challenge, a statute that imposed a higher penalty on assaults motivated by racial animus).

Relying on *Dawson v. Delaware*, 503 US 159, 112 S Ct 1093, 117 L Ed 2d 309 (1992), defendant argues that the trial court's rulings admitting evidence of his interest in satanism and death metal music violated his First Amendment rights. We read *Dawson* more narrowly. The Court explained in *Dawson* that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165. And it was careful to explain that a court may consider a defendant's reasons for committing a criminal act in imposing a sentence, even though the

expression of those reasons, unalloyed to any criminal act, would be constitutionally protected. *See id.* at 164 (discussing *Barclay v. Florida*, 463 US 939, 103 S Ct 3418, 77 L Ed 2d 1134 (1983)); *accord Wisconsin v. Mitchell*, 508 US 476, 485-86, 113 S Ct 2194, 124 L Ed 2d 436 (1993) (applying *Dawson*). Conversely, where evidence of constitutionally protected expressive or associational activity "prove[s] nothing more than [the defendant's] abstract beliefs," the First Amendment prohibits its admission. *Mitchell*, 508 US at 486 (quoting *Dawson*, 503 US at 167 (second alteration in original)).

The question in *Dawson*, as the Court framed it, was whether the state could introduce evidence during the penalty phase of Dawson's capital murder trial that Dawson "was a member of an organization called the Aryan Brotherhood, where the evidence ha[d] no relevance to the issues being decided in the proceeding." *Dawson*, 503 US at 160. The Court held that, where evidence of Dawson's exercise of his associational rights (membership in the Aryan Brotherhood) "proved nothing more than [his] abstract beliefs," the admission of that evidence violated his First Amendment rights. *Id.* at 167. One year after the Court decided *Dawson*, it upheld, against a First Amendment challenge, a Wisconsin statute that imposed an enhanced penalty on assaults motivated by racial animus. *Mitchell*, 508 US at 490. The Court recognized that the defendant's expression of racial animus, unconnected to any crime, would be constitutionally protected. *See id.* at 485-86 (citing *Dawson*). It held, however, that the First Amendment neither barred the admission of evidence of the defendant's racial animus to prove his motive for committing the assault nor prevented the imposition of a greater penalty on racially motivated assaults. *Id.* at 486-88.

This case is a far cry from *Dawson*. As explained above, evidence of defendant's interest in satanism and preference for death metal music was relevant to prove defendant's motive for participating in the murder of one person and for attempting to murder another person during the Dari Mart robbery. And the reason why defendant participated in one murder and attempted to commit another was relevant both to his future dangerousness and to his culpability for those acts and, thus, to the weight that the jury was entitled to give that aggravating evidence in deciding whether to

impose the death penalty. This is not a case in which the evidence proved only defendant's abstract beliefs. Rather, this is a case in which, as in *Mitchell*, the challenged evidence proved the motive for the crime. As such, its admission did not violate defendant's First Amendment rights.

In his twenty-seventh assignment of error, defendant argues that the trial court erred in overruling his amended demurrer. This court has not previously addressed one of the issues that defendant raised in his demurrer and reiterates on review. Specifically, we have not addressed defendant's argument that ORS 163.150 is unconstitutional because it does not require the jury to agree unanimously on the aggravating evidence that each juror considers in deciding the fourth penalty-phase question.

On that issue, ORS 163.150 provides that the fourth question that the jury must decide in the penalty phase is "[w]hether the defendant should receive a death sentence." ORS 163.150(1)(b)(D). ORS 163.150 directs the trial court to instruct the jury to answer that question "no,"

"if, after considering any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense and any victim impact evidence as described in paragraph (a) of this subsection, one or more of the jurors believe that the defendant should not receive a death sentence."

ORS 163.150(1)(c)(B). Defendant demurred to the indictment on the ground that ORS 163.150(1)(c)(B) is unconstitutional because it does not require that all the jurors agree on the specific aggravating evidence that informs each juror's answer to the fourth question.

To the extent that defendant argues that ORS 163.150(1)(c)(B) is facially unconstitutional, his argument fails. Even if we were to assume, as defendant argues, that either Article I, section 11, or the Sixth Amendment requires juror unanimity on aggravating evidence, ORS 163.150(1)(c)(B) is capable of constitutional application. That statute does not preclude a trial court from instructing the jurors that all of them must agree on the aggravating evidence that each of them considers in deciding the fourth

question. Rather, the statute leaves a trial court free to give such an instruction, if that is what either the state or the federal constitution requires. It follows that, even if the premise of defendant's argument were correct, and we express no opinion on that issue, the statute is not facially unconstitutional. *See MacPherson v. DAS*, 340 Or 117, 139, 130 P3d 308 (2006) (except for free speech challenges, persons "asserting [a] facial challenge [to a statute] bear [a] 'heavy burden' to demonstrate that [the] statute cannot be constitutionally applied under any circumstance").

To the extent that defendant argues that ORS 163.150(1)(c)(B) was applied unconstitutionally in this case, he cannot raise that issue by way of a demurrer. *See Fanus*, 336 Or at 68. As this court explained in *Fanus*, "the possibility of an unconstitutional application of [a statute] to the defendant's case [i]s not a defect appearing on the face of the accusatory instrument or otherwise grounds for demurrer under ORS 135.360." *Id.* If defendant wanted to preserve the issue, he should have asked the trial court to instruct the jury that all of them had to agree on the aggravating evidence. If the trial court declined to give the instruction, then defendant could have assigned error to that ruling. Defendant did not do so, and we express no opinion on the question whether defendant's argument—that jurors must unanimously agree on the specific aggravating evidence that informs each juror's decision whether to impose the death penalty—has any merit. It is sufficient to hold only that the trial court correctly overruled defendant's demurrer. Having considered all of defendant's assignments of error, we affirm the trial court's judgment and sentence.

The judgment of conviction and sentence of death are affirmed.