No. 30          May 5, 2016          507

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent,*

*v.*

BRUCE ALDON TURNIDGE,
*Appellant.*

(CC 08C53913; SC S059156)

On automatic and direct review of the judgment of conviction and sentences of death imposed by the Marion County Circuit Court.

Thomas M. Hart, Judge.

Argued and submitted January 15, 2015.

W. Keith Goody, Cougar, Washington, argued the cause for appellant. Andy Simrin, Portland, filed the brief for appellant.

Susan G. Howe, Senior Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With her on the brief were Anna M. Joyce, Solicitor General, and Timothy A. Sylwester, Assistant Attorney General.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, Brewer, Justices, and Linder, Senior Justice pro tempore.*

LINDER, S. J.

The judgment of conviction and sentences of death are affirmed.

_____
* Nakamoto, J., did not participate in the consideration or decision of this case.

**LINDER, S. J.**

Defendant was convicted on 10 counts of aggravated murder, as well as other felonies, following a joint trial with his son, Joshua, whose criminal convictions we affirm on this date. *State v. Turnidge (S059155)*, 359 Or 364, ___ P3d ___ (2016) (*Turnidge (Joshua)*). Defendant and Joshua both were sentenced to death. In this automatic and direct review of his convictions and sentences of death, defendant challenges the sufficiency of the evidence to support four of his 10 aggravated murder convictions; he raises numerous challenges to other trial court rulings as well. By way of relief, defendant seeks outright reversal of four of his aggravated murder convictions or, alternatively, remand for a new trial on those charges or on all counts, and remand for resentencing. For the reasons set out below, we affirm defendant's convictions and sentences of death.

This case arises from a December 2008 bombing of a bank in Woodburn. After a life-threatening phone call was made to an adjacent bank, and an employee was told that the lives of employees in both banks were at risk, law enforcement officers responded to the scene and discovered the bomb, which they assessed and treated as a hoax device. While law enforcement officers were trying to dismantle the bomb, it exploded. Two law enforcement officers were killed; a third law enforcement officer was critically injured, but survived; a bank employee was also injured. The factual details surrounding those events are set out at length in our opinion in *Turnidge (Joshua)*, 359 Or at 366-69, and we incorporate and rely on them here.

The investigation of the bombing led to defendant and Joshua as suspects. Within days of the bombing, they were arrested. *See id.* at 370-73 (describing investigation and arrests). Eventually, they were jointly indicted and jointly tried, each on 10 counts of aggravated murder, which included four counts of aggravated felony murder; they were also charged with related felonies. After the jury returned verdicts of guilt on all counts, separate penalty-phase trials were conducted, and the jury voted to impose the death penalty on both defendant and Joshua. The trial court merged all the aggravated murder convictions relating to each

murder victim and then entered identical judgments, one against defendant and one against Joshua, each setting out two convictions for aggravated murder (one for each victim who died) and two sentences of death.

On direct review, defendant raises 24 assignments of error, many of which are identical or substantially similar to those that Joshua also has raised and that we have rejected in *Turnidge (Joshua)*. We reject those arguments in this case for the same reasons that we did so in *Turnidge (Joshua)*. Defendant raises several additional assignments of error to rulings that the trial court made or as to other issues that arose during the pretrial, guilt, and penalty phases of his trial. For those issues that merit discussion, we address defendant's arguments in that order below. As needed for our analysis, we also set out additional historical and procedural facts not set out in *Turnidge (Joshua)*.

## I. PRETRIAL PHASE

A. *Excusal of Jurors for Cause and Destruction of Completed Jury Questionnaires (Assignment Nos. 1-4)*

In defendant's first four assignments of error, he raises claims that are essentially the same as those raised and resolved against his position in *Turnidge(Joshua)*. Specifically, defendant challenges the trial court's decision, during *voir dire*, to excuse three prospective jurors for cause, based on their responses to questions assessing their ability to follow the law and their oaths, and to impose the death penalty if they found that the facts—under the law—warranted that penalty. Defendant also challenges the court's decision to destroy the completed juror questionnaires after *voir dire*, over defendant's objection, rather than retain them as part of the record. We reject defendant's arguments for the reasons set out in *Turnidge (Joshua)*, 359 Or at 406-26.

B. *Evidence of Defendant's Views About Law Enforcement and Other Political Beliefs (Assignment Nos. 9-15)*

We next consider defendant's arguments that the trial court erred in denying his pretrial motions to exclude various statements that he had made, before the crimes in

this case, arguing that they were not relevant under OEC 401.[1]

### 1. *Additional facts and parties' arguments on review*

The statements at issue fall into three groups. The first group involved statements that defendant made approximately 30 years before the bombing; in those statements, defendant talked about possibly detonating a bomb during a police officer memorial with the objective of killing police officers attending the memorial. The next group of statements were made in 1995, when defendant cheered the bombing of the federal courthouse in Oklahoma City and made comments heroizing one of the individuals responsible for the bombing. *See Turnidge (Joshua)*, 359 Or at 378 (generally describing defendant's reaction to and statements about Oklahoma City bombing). The final group of statements reflected defendant's antipathy toward the government, his desires to form a militia to resist governmental authority, his acquisition of ammunition and weapons, and his threat to a person to whom he owed money.[2]

---

[1] Below, in addition to relying on OEC 401, defendant cited OEC 403 and OEC 404, but he made no specific argument explaining why the challenged evidence was not admissible under either of those provisions. On review, defendant again relies on OEC 401 (relevance), but does not make any argument about the challenged evidence under either OEC 403 or OEC 404. Accordingly, we address only defendant's relevancy arguments.

[2] In his motion *in limine*, defendant sought to exclude, among other things:

"Statements of [witness] Kerr, including the following: characterizing financial arrangements with [defendant] during the 1990s and the alleged theft of property in Nevada; [defendant] requesting a $75,000 loan to finance the purchase of military grade weapons; statements that [defendant] was burying weapons in the desert; statements that [defendant] felt that the FBI were criminals; statements that [defendant] wanted to build a fort on the Nevada property to be ready when the government came to get him; statements that [defendant] Bruce Turnidge felt that Timothy McVeigh did a good thing in Oklahoma City, and an episode in which *** Kerr claims he was threatened by [defendant]."

Defendant's motion did not provide further information about the threat to Kerr, and neither party discussed that specific evidence during the hearing. On review, defendant does not make a legal argument specific to the threat; he instead merely identifies it as part of the evidence of his anti-government beliefs and activities that he asserts was not relevant or, if relevant, was too prejudicial to be admissible. At trial, Kerr, who testified only briefly, described the threat as having been made when Kerr tried to foreclose on property that defendant owned in Nevada (which was the property on which defendant wanted to build an armed fortress to resist the government). For purposes of review, in light of the context in which the threat was made, we consider the evidence of that threat to be part

At a pretrial hearing on his motion, defendant argued that statements about bombing the police memorial and his support for the Oklahoma City bombing were remote in time to the charged crimes and did not involve anything similar to a bank robbery. Therefore, defendant argued, that evidence was not relevant to establish intent. As for the evidence of defendant's anti-government sentiments, desires to form an anti-government militia, and acquiring weapons and ammunition, defendant argued that that evidence was not probative of any motive for committing the crimes charged in this case. The state responded that, although some of the evidence was remote in time, it demonstrated defendant's longstanding anti-government sentiments and support for killing government officials and employees, all of which were probative of defendant's motive to orchestrate a bombing in circumstances that would draw law enforcement to the bomb to respond. The state also argued that the evidence of defendant's attempts to form a militia demonstrated his motive to rob a bank—to fund his anti-government militia.

On review, defendant reiterates his argument that the challenged evidence is not relevant because neither his anti-government sentiments nor his militia-related activities were sufficiently connected or similar to the bombing at issue in this case. He argues that, because the bank was privately owned, his anti-government sentiments were not relevant to its bombing and that the state's theory that his motive was to fund militia-related activities was purely speculative.

2.  *Analysis*

Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. The threshold for admissibility under that relevancy standard is "very low"—as long as the evidence, based on logic and experience, can support a reasonable inference

---

and parcel of the general evidence relating to defendant's anti-government sentiments and his efforts to form a militia.

that is material to the case, then the evidence is sufficiently relevant to be admissible, even if that is not the only inference that the evidence would support. *State v. Titus*, 328 Or 475, 480-81, 982 P2d 1133 (1999).

As described, the state argued at trial that evidence of defendant's statements was relevant to motive. Renewing its position on review, the state relies on *State v. Hayward*, 327 Or 397, 963 P2d 667 (1998), for the proposition that evidence that provides a logical inference of motive is relevant in a criminal prosecution, even though motive is not an element that the state must prove. The facts and analysis in *Hayward* helpfully illustrate that general proposition. We therefore begin with that case.

In *Hayward*, the defendant and his accomplices, some of whom considered themselves satanists, listened to death metal music before going to a Dari Mart convenience store and robbing it. *Id.* at 399-400. During the robbery, they killed one clerk and attempted to kill a second. The defendant sought to exclude the evidence of their obsession with satanism and death metal music as irrelevant. *Id.* at 406. This court concluded, however, that the trial court had properly admitted that evidence as probative of motive, explaining:

> "One of the theories underlying [the] charges was that death metal music and satanism provided at least one of the motives for defendant [and his accomplices] when they planned and committed the Dari Mart crimes. The testimony to which defendant objected was relevant to the state's theory that defendant and the others intended to commit murder, not merely robbery, when they entered the Dari Mart. The evidence also was relevant to help explain the brutality of the attacks on [two victims] and to explain the group's intention that [the murder victim] also die, not merely to cover up evidence of their other crimes, but also to allow them to carve satanic symbols on the bodies or to leave other blood evidence of satanism at the scene."

*Id.* at 407; *see also State v. Brumwell*, 350 Or 93, 103-04, 249 P3d 965 (2011) (evidence of satanism and death metal music in context of Dari Mart murder was relevant and admissible during penalty phase of trial of different participant who

later committed another murder); *Turnidge (Joshua)*, 359
Or at 451-52 (explaining that, in *Hayward* and *Brumwell*,
after evaluating nature of disputed evidence in light of cir-
cumstances of crime, court concluded that record in both
cases showed connection between disputed evidence and
defendants' motives and intent).

  Likewise, here, evidence of defendant's longstand-
ing anti-government sentiments, his professed desire to kill
police officers, his interest in and enthusiastic approval of
bombings of governmental facilities, and his efforts to form
and arm an anti-government militia all logically tended to
support to the state's theory about why defendant commit-
ted the charged crimes. The key evidence supporting the
state's theories of motive is described in detail in *Turnidge
(Joshua), id.* at 377-78. But to briefly recap, from the state's
evidence, the jury reasonably could find that defendant and
Joshua had purchased items with which to construct a highly
lethal bomb, had constructed that bomb in a pole barn on
defendant's property, and had called in a threat to a bank
next-door to the bank where they had planted the bomb,
mentioning both banks in that call. The phone call included
a death threat and instructions that, the jury reasonably
could find, were designed to facilitate a bank robbery and
to draw law enforcement to the scene. The state's theory of
the case was that defendant had a mixed motive in taking
those actions: He wanted to rob one or both banks, and he
wanted to kill law enforcement officers who responded to the
bomb threat. Evidence of defendant's anti-government sen-
timents and activities, his desires to form anti-government
militias, his celebration of the Oklahoma City bombing, and
his infatuation with the idea of killing police officers at a
police memorial all logically supported the state's theory of
why defendant engaged in the bombing.

  Contrary to defendant's suggestion, any connection
between the bombing of the bank in this case and his past
statements and actions was not entirely speculative. Motive,
like other mental states, often can be established only cir-
cumstantially. *State v. Rose*, 311 Or 274, 283, 283 n 7, 810
P2d 839 (1991). The fact that the evidence is circumstan-
tial does not make it speculative. Here, the challenged evi-
dence provided a direct basis on which a jury could factually

determine that defendant harbored hostility toward government officials and law enforcement. Those were not abstract hostilities, however. The challenged evidence was a basis on which the jury could conclude that defendant spent time, in his own mind's eye, visualizing acting on those hostilities in violent ways that were designed to give him the satisfaction of killing officials and law enforcement officers. That was direct evidence of what defendant subjectively believed and desired to do, which in turn provided an inferential basis from which a jury could find that defendant was motivated by his beliefs and hostility to plant a bomb in circumstances that would result—or so defendant intended—in obtaining money from a bank and killing law enforcement officers who might try to disarm the bomb. Although that inference of motive might not be compelled by the evidence, it is one that a jury reasonably and logically could draw.

The challenged evidence was, therefore, admissible over defendant's relevancy objection. *See Turnidge (Joshua)*, 359 Or at 452-53 (similarly concluding that sufficient connection existed between Joshua's anti-government views and motive). The trial court properly denied defendant's motion *in limine* to exclude the challenged evidence.

## II.   GUILT PHASE

### A.   *Jury Instructions, "Acquittal-First" (Assignments No.5-6)*

Defendant next argues that, on the four aggravated felony murder charges, the trial court erred by giving an "acquittal-first" jury instruction based on ORS 136.460(2).[3]

---

[3] Although defendant did not except to the jury instruction, we conclude that he adequately raised the constitutional issue that we address in *Turnidge (Joshua)* by joining in Joshua's motion to have ORS 136.460(2) declared unconstitutional based on the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

Defendant also urges this court to consider an unpreserved statutory argument that felony murder is not a "lesser-included offense" of aggravated felony murder for purposes of ORS 136.460(2) because ORS 136.460(1) refers to crimes "of different degrees." Defendant appears to assert that ORS 136.460 does not apply to aggravated felony murder because the murder statutes do not describe murder offenses in terms of "degrees." Defendant notes that this court has often indicated its willingness to consider unpreserved questions that provide a subconstitutional basis for deciding a legal issue. *See, e.g., Li v. State of Oregon,* 338 Or 376, 391, 110 P3d 91 (2005) ("This court decides cases on subconstitutional

We also addressed that same issue in *Turnidge (Joshua)* and concluded that the trial court properly gave the challenged instruction. *Id.* at 497. We reject defendant's arguments for the reasons set out in that case.

B. *Motion for Judgment of Acquittal, Proof of "Intent," and "Personally" Elements (Assignment Nos. 7-8)*

Defendant moved for judgment of acquittal on the four counts of aggravated felony murder, urging that the evidence was insufficient to prove that he committed the murders "personally and intentionally," as required by ORS 163.095(2)(d). The arguments that he made in support of his motion, and that he renews before this court, are essentially the same arguments that we rejected in *Turnidge (Joshua)*, 359 Or at 458-59; *id.* at 463-68; *id.* at 485-91. Consequently, we reject his arguments for the reasons set out in our opinion in that case.

C. *Jury Instructions, "Causation" (Assignments Nos. 16-20)*

Defendant proposed jury instructions on causation that the trial court declined to give. He assigns error to the trial court's refusal to give those instructions and requests reversal on all counts. The instructions that defendant requested, and the supporting arguments that he made below and now renews on review, are not, in any substantive way, distinguishable from the proposed instructions and arguments in their support that we addressed in *Turnidge (Joshua)*, 359 Or at 482-85. For the same reasons that led us in *Turnidge (Joshua)* to conclude that the trial court properly declined to give those requested instructions, we reject defendant's parallel arguments in this case.

---

grounds when it can, even if the parties present only constitutional arguments for the court's consideration."). That is a prudential rule, however, and it is not appropriate in every case. Defendant's subconstitutional argument that the acquittal-first statute, ORS 136.460, does not apply to aggravated felony murder because felony murder is not a "lesser included offense" of that crime is potentially *more* problematic under *Beck v. Alabama*, 447 US 625, 100 S Ct 2382, 65 L Ed 2d 392 (1980), than construing ORS 136.460 to apply here. That construction would leave defendant in a position of having no lesser-included instruction at all despite evidence that would support it, which *Beck* held is unconstitutional, as we have discussed in *Turnidge (Joshua)*, 359 Or at 496. Accordingly, we decline to address defendant's subconstitutional argument, which, in all events, consists of only two sentences and is significantly underdeveloped.

## III.   PENALTY PHASE

### A.   *Right to Allocution (Assignment No. 23)*

Defendant next raises an unpreserved argument that he urges us to consider as plain error. In particular, he argues that the trial court erred in making a statement to him about the nature of his right to allocution at the penalty phase. He claims that that statement caused him not to address the jury on the issue whether he should be sentenced to death, which in turn potentially affected the jury's decision. As a remedy, defendant seeks to have the sentences of death vacated and the case otherwise remanded for a new penalty-phase proceeding. As explained below—even assuming that the issue raised is one of law—we conclude that the legal point is reasonably in dispute and, additionally, that the record gives rise to competing inferences about the statement's import, given the context in which the court made it. Accordingly, we conclude that the alleged error does not satisfy the requirements for plain error review.

### 1.   *Additional facts and parties' arguments on review*

At the conclusion of the evidence during defendant's penalty-phase trial, the trial court engaged in the following on-the-record colloquy with defendant, after clearing the courtroom of everyone except defendant and defense counsel:

> "THE COURT:   You have a right to address the jury that has the decision for making the sentence in your case. It's called a right to allocute, right to speak aloud to them, to tell them what you think the sentence ought to be, and it's been indicated to me by counsel that you have chosen not to come to the stand and talk to the jury about what you think the sentence ought to be. Is that your decision?

> "MR. BRUCE TURNIDGE:   Yes.

> "THE COURT:   Do you have any questions for me about that right?

> "MR. BRUCE TURNIDGE:   No. I don't think—they will make up their mind. They don't [*sic*] me to enter—

> "THE COURT:   I don't disagree with that either, but you have a right, and I need to deal with that. *And, of course,*

*you would also be subject probably to cross-examination were you to do that, too.* So you understand the choices that you're making. You appear to have been attentive to all of your choices so far. So at least we've made this part clear on the record, that—

"MR. BRUCE TURNIDGE: Yes.

"THE COURT: —this is your choice even after talking with counsel.

"MR. BRUCE TURNIDGE: Yeah."

(Emphasis added.) Neither defendant nor his counsel objected or otherwise voiced any concern about that exchange or the adequacy of defendant's waiver of his right to allocution.

On review, defendant argues that the trial court plainly erred when it stated that defendant would "be subject probably to cross-examination" during allocution. The state responds that defendant did not preserve that argument and that the error does not qualify as one that we can reach as plain error. Our analysis thus is framed by *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990), which explained that an appellate court may review an unpreserved error as plain error if (1) it is an error of law; (2) it is apparent, that is, "the legal point is obvious, not reasonably in dispute"; and (3) it appears on the face of the record, meaning that the court "need not go outside the record or choose between competing inferences to find it, and the facts that comprise the error are irrefutable."

2. *Analysis*

Article I, section 11, of the Oregon Constitution, provides, in part, that, "in all criminal prosecutions, the accused shall have the right *** to be heard by himself and counsel." An accused defendant's right to be heard under that provision encompasses the common-law right to allocution— that is, "a convicted defendant's opportunity to speak before sentencing." *DeAngelo v. Schiedler*, 306 Or 91, 93-94, 93 n 1, 757 P2d 1355 (1988). In exercising that right, a defendant generally is permitted to "make any statements relevant to existing sentencing and parole practices"; "state any reason why he or she feels sentence should not be pronounced[;]

and, in addition to presenting mitigating evidence, be given an opportunity to make any relevant personal comments[.]" *Id.* at 95-96. Because the right to allocution evolved in a context in which sentencing was a function of the court rather than of a jury, this court initially characterized it in terms of a defendant's right to make statements about sentencing "to the court." *Id.* at 96. In *State v. Rogers*, 330 Or 282, 4 P3d 1261 (2000), however, this court clarified that a defendant also is entitled to allocute to a jury during the penalty phase in a capital proceeding. *Rogers* provides significant context for the issue present in this case, and, accordingly, we discuss it at some length.

In *Rogers*, the defendant, who had been convicted on multiple charges of aggravated murder, sought to make an unsworn statement to the penalty-phase jury. The trial court ruled that the defendant could make such a statement, but needed to submit what he intended to say in writing to the court in advance. The defendant did so, and the court permitted him to read an edited version of his statement to the jury. *Id.* at 292-93. On review, the defendant argued that the court violated his right to allocution by requiring him to submit his statement in advance, by editing his statement, and by requiring him to read a prepared statement rather than speak extemporaneously. *Id.* at 293. As a threshold proposition, the state responded that the right to allocution did not encompass making an unsworn statement; rather, a defendant's constitutional right to be heard was satisfied by the ability to "take the stand and offer sworn testimony subject to cross-examination." *Id.* at 294.

This court therefore first addressed whether the defendant in *Rogers* "had a right to make an unsworn statement to the jury, apart from any right to take the stand and testify under oath." *Id.* at 296. The court began its analysis by noting that the phrasing of Article I, section 11, indicating that the right was "to be heard by himself and counsel," suggested a right to "present argument without taking the stand, similar to the way in which his counsel may make an unsworn closing statement to the factfinder." *Id.* at 297. The court then reviewed the historical context of Article I, section 11, ultimately concluding that the right to allocution

guaranteed by that constitutional provision includes the right to make an unsworn statement to the jury in the penalty phase of a capital proceeding.

The court in *Rogers* went on to conclude, however, that, "especially in the case of statements by a defendant not made in response to questioning under oath, the trial court has a legitimate concern with assuring that the defendant does not make irrelevant or prejudicial statements." *Id.* at 301. The court therefore reasoned that, although a trial court is obliged to accommodate a defendant's exercise of constitutional rights, it has discretion to ensure that the trial is carried out in an "orderly and expeditious" manner. Consequently, the restrictions placed on the defendant in that case did not violate the defendant's rights under Article I, section 11. *Id.*

Defendant argues that the trial court's statement, in the colloquy quoted above, that defendant would "be subject probably to cross-examination," should be reviewed "for errors of law" and was legally incorrect. Given the context in which the trial court made the challenged statement and the nature of our review, as explained below, we conclude that the court did not commit a plain error of law.

The brief colloquy about defendant's decision to waive his right to allocution took place during the penalty phase, after the close of defendant's evidence. Significantly, that colloquy also occurred—presumably at defendant's request—outside the presence of the prosecutors. The apparent purpose of the colloquy was to put on the record defendant's choice *not* to allocute at sentencing, a choice that, the record suggests, defendant by then already had made after consulting with counsel. It was not until defendant advised the trial court of his choice *not* to allocute that the court remarked that defendant "would also be subject *probably* to cross-examination." (Emphasis added.) The court's remark was thus made in a context in which no ruling was either requested or required. Given that fact, we fail to see how the remark qualifies as an operative decision or ruling susceptible to challenge on review, either as a preserved issue or a claim of "plain error." *See* ORAP 5.45(3) (in assigning

error on appeal, appellant must "identify precisely the legal, procedural, factual or other *ruling* that is being challenged" (emphasis added)). That conclusion follows with added force when, as here, the trial court's remark had no apparent effect on either the defendant's course of action or the course of the trial or sentencing proceeding.

Defendant nevertheless argues that the colloquy, and the fact that defense counsel did not object to the trial court's remark, demonstrates "that either Defendant had been improperly informed when he was first apprised of his right to allocution, or that he was never properly informed about the nature of his right at all." If we understand defendant's point, he asks us to infer from his counsel's failure to respond to the court's remark that his counsel must have advised him that he would be subject to cross-examination if he exercised his right to allocute or—at the least—that whatever advice his counsel had given him was somehow not accurate. Based on those alternative scenarios, defendant argues that his waiver of his right to allocution could not have been knowing and intelligent.

Defendant, however, cites no authority for the proposition that speculation about what might or might not have occurred off the record provides a basis for "plain error" reversal of a conviction. Indeed, *Brown* indicates otherwise: Even when the alleged error is one of law and the legal point is beyond dispute, we nevertheless do not review the "plain error" unless it appears "on the record," meaning that we "need not go outside the record or choose between competing inferences to find it, and the facts that comprise the error are irrefutable." *Brown*, 310 Or at 355.[4] Here, the record does not indicate what defendant was or was not told about

---

[4] Defendant urges that *Rogers*, 330 Or 301, held that a defendant could never be subject to cross-examination during sentencing, but that case did not so hold. And, as this court recently recognized in *State v. Guzek*, 358 Or 251, 278-79, 363 P3d 480 (2015), some—although not all—of the historical reasons for the right to allocution no longer have vitality. Perhaps the most notable change, for purposes of a capital case, is that the right to allocution is exercised in front of a jury, not a judge, which raises evidentiary issues. How that and other changes might bear on the scope of the right to allocution and on the potential for cross-examination of a defendant who exercises that right in a way that places additional "evidence" before the jury is far from beyond dispute.

his Article I, section 11, rights before he made his decision not to allocute to the jury during the penalty phase. Neither does the record suggest that the trial court's comment had any effect on defendant's decision. Consequently, we conclude that no error is apparent on the record.[5]

### B. *Prosecutor's Closing Statement (Assignment No. 24)*

Defendant's next argument presents us with another unpreserved issue that he asks us to consider as plain error. Defendant contends that the trial court *sua sponte* should have taken "corrective action" when the prosecutor, during closing argument, made statements that, defendant asserts, "urg[ed] the jury to sentence defendant to death in order to silence him." The statements that defendant challenges were made after the prosecutor referred in closing argument to the testimony of a witness—an inmate with a low level of education—who had described defendant as "brilliant." The prosecutor then asserted that "[t]hat [type of person] is who [defendant] will influence inside the prison, and then when those people get out, he will influence them outside the prison." Later, at another point during closing argument, the prosecutor urged the jury that the only sentence that would "silence" defendant was a death sentence. As we understand defendant's point, defendant contends that the prosecutor's closing argument violated his free speech rights under the First Amendment to the United States Constitution.[6]

---

[5] In addition, even if we were to conclude that the trial court's remark amounted to plain error, we still would have to exercise our discretion to decide whether to correct that error. One consideration that weighs against reaching an unpreserved error is "whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error." *Ailes v. Portland Meadow, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991). The challenged remark that the trial court made here was made outside the presence of the prosecutors. Thus, not only was the court not making an operative ruling that defendant would be subject to cross-examination, but the court also was not presented with legal arguments on the matter by *either* party. And because defendant voiced no objection, the court had no opportunity to clarify what had prompted its remark, to determine whether that remark had any bearing on defendant's decision, or to retract or clarify the remark. Those circumstances would have significant bearing on whether we would exercise our discretion to reach this issue, even if the issue qualified as plain error, which it does not.

[6] The First Amendment provides that "Congress shall make no law *** abridging the freedom of speech[.]" It applies to the states through the Due Process Clause of the Fourteenth Amendment. *Presley v. Georgia*, 558 US 209, 211-12, 130 S Ct 721, 175 L Ed 2d 675 (2010).

The state responds that defendant takes those statements out of context. The state asserts that the prosecutor was appropriately addressing the issue of defendant's future dangerousness, which the jury was required to consider during the penalty phase of the trial. *See* ORS 163.150(1)(b)(B) (penalty-phase jury must answer question whether probability exists that defendant will commit violent criminal acts constituting continuing threat to society). The prosecutor had pointed to penalty-phase evidence of defendant's past threats and offers to kill others, as well as to defendant's zeal to form an anti-government militia and spread his violent anti-government ideologies. In that context, according to the state, the prosecutor was referring to defendant's dangerousness in terms of his willingness to commit crimes based on his violent ideologies and his desire to influence others to commit crimes in pursuit of those same ideologies.

We agree that the prosecutor's comments, taken as a whole and in context, support the interpretation that the state advances. Thus, the prosecutor's argument was a permissible one, based on the evidence before the jury and the question of future dangerousness that the jury had to decide.

Defendant cites no authority for the proposition that a jury may not consider that type of evidence in assessing future dangerousness in the penalty phase of a capital proceeding or that the prosecutor is barred from making arguments pertaining to evidence of that kind. The primary case on which defendant relies is *Dawson v. Delaware*, 503 US 159, 112 S Ct 1093, 117 L Ed 2d 309 (1992). There, the United States Supreme Court held that evidence of a defendant's membership in a racist Aryan Brotherhood prison gang was irrelevant and inadmissible in a capital murder proceeding. The victim in *Dawson* had been white, and the murder had been carried out in the course of a robbery that the defendant allegedly had committed after escaping from prison. The Supreme Court reasoned that the evidence at issue did not establish any connection between the Aryan Brotherhood and violent escape attempts, but, instead, established only that the Aryan Brotherhood was a prison gang that held white racist beliefs. *Id.* at 165-66. The Court

specifically noted, however, that it had "previously upheld the consideration, in a capital sentencing proceeding, of evidence of *** subversive advocacy where such evidence was relevant to the issues involved." *Id.* at 164 (citing *Barclay v. Florida*, 463 US 939, 103 S Ct 3418, 77 L Ed 2d 1134 (1983)); *see also id.* at 166 ("A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future.").

Contrary to defendant's assertions, this is not a situation in which the prosecutor's statements urged the jury to punish defendant because of his abstract political beliefs or statements. Rather, the state had presented evidence of defendant's beliefs that directly bore on his motivation for the murders at issue in this case, on his reasons for threatening to commit other crimes, and on his willingness to encourage others to follow those beliefs. Based on that evidence, the prosecutor's comments invited the jury to draw reasonable and permissible inferences about defendant's future dangerousness. The trial court did not err in failing to *sua sponte* prevent the prosecutor from making those arguments.

## IV. CONCLUSION

We reject defendant's remaining assignments of error without discussion, including those advanced in defendant's supplemental *pro se* brief. Having rejected all defendant's assignments of error, we affirm the judgment of conviction and the sentences of death.

The judgment of conviction and sentences of death are affirmed.