Argued and submitted May 4, judgment of conviction and sentence of death
affirmed July 24, 1998

STATE OF OREGON,
*Respondent,*

*v.*

MICHAEL JAMES HAYWARD,
*Appellant.*

(CC 10-94-08860; SC S43096)

963 P2d 667

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause and filed the brief for appellant. With him on the brief was Sally L. Avera, Public Defender.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Leeson, Justices.*

LEESON, J.

---

* Kulongoski, J., did not participate in the consideration or decision of this case.

## LEESON, J.

This is an automatic and direct review of a judgment of conviction and a sentence of death. ORS 163.150(1)(g); ORAP 12.10(1). Defendant seeks reversal of his conviction on three counts of aggravated murder, ORS 163.095, one count of intentional murder, ORS 163.115, two counts of felony murder, ORS 163.115, two counts of attempted aggravated murder, ORS 161.405; ORS 163.095, one count of first-degree assault, ORS 163.185, one count of first-degree kidnapping, ORS 163.235, one count of first-degree robbery, ORS 164.415, and one count of first-degree burglary, ORS 164.225. Alternatively, defendant asks this court to vacate his death sentence. We affirm the judgment of conviction and the sentence of death.

## I. FACTS

Because the jury found defendant guilty, we review the evidence in the light most favorable to the state. *State v. McDonnell*, 313 Or 478, 480, 837 P2d 941 (1992).

On April 10, 1994, four young men—Jason Brock, Daniel Rabago, Jason Brumwell, and Johl Brock—met at Brumwell's house and discussed committing a robbery in order to get money to buy marijuana. They decided to rob the Dari Mart on Royal Avenue in Eugene. That afternoon, they went to the store to see how many people worked there and whether there were surveillance cameras. They returned to Brumwell's house and continued to discuss the robbery. Jason Brock then went to work and played no role in the events that followed.

The other three drove to defendant's house in Johl Brock's car to ask defendant, Michael Hayward, if he would like to join them in robbing the Dari Mart. Defendant agreed to participate and got into Brock's car to discuss plans for the robbery. They listened to "death metal" music[1] while they

---

[1] "Death metal" music, a variation on heavy metal music, features lyrics about death and satanism. Titles of death metal music to which the young men listened include, "The Pick-Axe Murders," "An Experiment in Homicide," "Hammer Smashed Face," "Meat Hook Sodomy," "Gutted," and "Living Dissection."

made their plans. Rabago, Brumwell, and Brock, who considered themselves satanists, were members of a death metal band. Defendant was not a member of the band, but he enjoyed listening to death metal music. As Rabago testified, "we were all into evil and we were all pretty much deathers." Rabago described a "deather" as "someone that has a lot of hate in them and sees * * * the morbid things in life." During the discussions that took place in Brock's car, the four young men decided to kill their victims. They also discussed whether they would carve satanic symbols on the victims' bodies and whether they would leave a message written in the victims' blood on the Dari Mart wall. During the afternoon, they drove to Rabago's house to get weapons—a dumbbell bar, a thin metal bar about two feet long with one pointed end, a chisel-type hammer, and a knife. From Rabago's house, the four drove to the Dari Mart. Defendant and Johl Brock went in, and defendant bought cigarettes. They left the store to wait until closer to its 11:00 p.m. closing time before committing the crimes.

Just before returning to the Dari Mart, the group listened to more death metal music to "kill time" and become motivated about the crimes they were about to commit. At about 10:35 p.m., Donna Ream, one of the two clerks on duty at the Dari Mart, saw defendant standing in front of a window outside the store. He smiled and waved at her. A few minutes before 11:00 p.m., Rabago, Brumwell, Brock, and defendant went into the Dari Mart. Each young man had an assigned "job" with respect to what transpired next.

Defendant, followed by Brock, went to the back of the store. Brumwell and Rabago remained in the front. Brumwell, holding the dumbbell bar over his head and emitting a deep growl, ran toward Ream, who was standing behind the check-out counter. Ream said the growl sounded like a growl she heard later on a death metal compact disc by a group called Cannibal Corpse. Ream jumped back in fright. Brumwell said he was just joking and asked her to give him the money in the cash register. Ream did so.[2]

---

[2] Rabago also took lottery tickets from the Dari Mart during the episode. Codes on the winning tickets that the men eventually cashed helped police identify and apprehend defendant and the others several months later.

Meanwhile, defendant and Brock encountered the second clerk, Frances Wall, stocking the cooler in the back of the store. Brock watched defendant strike Wall in the back of the head with the pointed, thin metal bar, knocking her to the ground. Wall attempted to protect her head from more blows by putting her arms in front of her face. Defendant struck her on the head with the bar five or six more times, striking her as hard as he could. The blows shattered Wall's skull. Brock left the store, drove his car some 50 yards away and waited for the others to come out. Meanwhile, Brumwell handed Rabago the dumbbell bar and told him to watch Ream while he joined defendant in the back room. At some point, defendant shoved the pointed bar completely through Wall's skull. She died at the scene.

Brumwell and defendant returned to the front of the store. Defendant, Brumwell, and Rabago then led Ream to the back room. Defendant told the others to hit her. Defendant told Brumwell that he had "killed his" and wanted to know why Brumwell could not kill Ream. Despite Ream's efforts to defend herself, defendant and Brumwell hit her with the dumbbell bar and the bar that defendant had used to kill Wall. They struck her more than 50 times on her head and on her arms, which she had raised to try to shield herself from the blows. They also kicked her and stabbed her with the knife. She ran into the Dari Mart's bathroom and tried to shut the door, but was unable to, because both of her arms had been broken in several places. Defendant and Brumwell followed her into the bathroom, where they continued to beat her. At one point Brumwell paused and asked her, "Why won't you just die, bitch?" Both men yelled profanities at Ream while they beat her. At one point, Brumwell shoved the dumbbell bar into Ream's mouth, knocking out two of her teeth.

Sometime during the attack on Ream, the young men heard the bell that rings in the back room when someone comes in the front door. They stopped beating Ream and left the store. Ream threw herself against the bathroom door to close it. When she heard a boy's voice in the front of the store, she called out to him to call the police. Then Ream ran from the store to a house across the street and collapsed on the floor when the residents let her in. A large portion of her

scalp was torn off by the blows to her head, a disk in her neck was herniated, she lost almost half of the blood in her body, and she suffered permanent damage to her arms and hands. Nonetheless, Ream never lost consciousness, and some months later she was able to identify photographs of her attackers, including defendant.

Several months after the Dari Mart crimes, Rabago, Brumwell, and defendant camped in the woods outside the town of Curtin for an extended period of time. While there, they discussed committing another crime, and possibly another murder, after the 1994 Labor Day weekend. They were arrested at the camp just before Labor Day. Soon after his arrest, defendant told police that he was not a satanist, but that he believed that "God is weak and Satan is strong." During his initial police interview, he showed no remorse for Wall's murder or the assault on Ream. He declared that Wall's was just another death, that "life ain't worth shit," and that Wall would have died anyway. Defendant seemed amused about the crimes and the fact that he had been arrested.

Rabago pleaded guilty to felony murder, attempted aggravated murder, first-degree assault, first-degree robbery, first-degree burglary and first-degree kidnapping for the Dari Mart crimes. Pursuant to a plea agreement, if Rabago testified truthfully for the state at defendant's trial, he would be sentenced to 12 years in prison. Johl Brock pleaded guilty to felony murder, first-degree kidnapping, first-degree robbery, and first-degree burglary. His plea agreement provided that if he testified truthfully for the state at defendant's trial, he would receive a sentence of 9 to 11 years. A jury convicted Brumwell of aggravated murder, intentional murder, two counts of felony murder, two counts of attempted aggravated murder, first-degree assault, first-degree robbery, first-degree kidnapping, and first-degree burglary. He was sentenced to life in prison without the possibility of parole.

Rabago, Johl Brock, Jason Brock, and Donna Ream testified for the state at defendant's trial. As noted at the outset, defendant was convicted of three counts of aggravated murder and many other crimes. During the penalty phase,

defendant testified that he read the Bible in prison, that he now believes in God, and that he cares about the victims' families. The jury voted unanimously to impose the death penalty.

## II. ASSIGNMENTS OF ERROR

### A. *Assignments of Error Regarding Pretrial Proceedings*

#### 1. *Plea Bargaining*

Defendant contends that the trial court erred in denying his motion to prohibit the death penalty, because

> "the district attorney did not have a systematic policy concerning plea negotiations in capital cases. Defendant's death sentence should be reversed because he was denied the opportunity to enter into plea negotiations in this case."

According to defendant, evidence in the record does not support the conclusion that the state had a systematic policy of plea negotiations in capital cases. Defendant's argument appears to be that, if a systematic plea bargaining system had been in place, the prosecutor would have entered into plea negotiations with him. The state responds that defendant's general, abstract concerns regarding the alleged lack of a systematic plea bargaining policy are irrelevant to the validity of his conviction and sentence and that defendant failed to complain at trial about the state's failure to engage in plea negotiations with him.

At trial, defendant argued that

> "[t]he manner in which the State makes its decision to seek the death penalty, not seek the death penalty, or to undertake plea bargaining is arbitrary and capricious and is not based upon a coherent and systematic scheme and therefore it violates the Defendant's rights under the 5th, 6th, 8th and 14th Amendments of the U.S. Constitution and Article [I], [s]ection 20[,] of the Oregon Constitution."

The trial court interpreted defendant's motion to prohibit the death penalty in this case "as an attack on the plea bargaining system" and conducted a pretrial hearing to examine

whether the Lane County District Attorney's office had a systematic policy for determining when to engage in plea negotiations in capital cases. The trial court ultimately denied defendant's motion. Because the trial court interpreted defendant's motion as a challenge to the Lane County District Attorney's policy for offering plea bargains and ruled on that issue, we conclude that defendant preserved his challenge to that policy. *See State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) (efficient judicial procedure requires that positions of parties are presented to initial tribunal and on appeal). As defendant has structured his argument, resolution of that issue also resolves his claim that the death penalty should be prohibited in this case, based on the state's refusal to engage in plea negotiations with him.

■        Whether a criminal defendant was improperly denied a plea offer is reviewed for an error of law. *McDonnell*, 313 Or at 484. The defendant must demonstrate the error. *Id.* at 494. Standardless or irrational prosecutorial plea bargaining decisions violate Article I, section 20, of the Oregon Constitution, *State v. Cunningham*, 320 Or 47, 66, 880 P2d 431 (1994), but prosecutorial discretion regarding plea bargaining does not violate Article I, section 20, if that discretion is exercised in the context of a coherent, systematic policy. *Id.* (citing *State v. Buchholz*, 309 Or 442, 446-47, 788 P2d 998 (1990)). If the decision not to offer a plea bargain satisfies the requirements of Article I, section 20, the Equal Protection Clause is complied with as well. *State v. Tucker*, 315 Or 321, 328, 845 P2d 904 (1993).

■        In this case, the trial court conducted a two-day hearing regarding the Lane County District Attorney's policy on plea bargaining. The district attorney, as well as present and past deputy district attorneys, described the manner in which death-penalty cases had been charged since 1984, the year in which the death penalty was reinstated in Oregon. They testified that the responsibility for charging in serious cases is delegated to the most senior deputies and that it is office policy to discuss charging and plea bargaining decisions with the district attorney as well as with trial team leaders. In deciding whether to seek the death penalty in an aggravated murder case, Lane County prosecutors are

guided by the criteria listed in ORS 163.095 (defining aggravated murder) and by their perceptions of the strengths and weaknesses of the state's case, both in the guilt and penalty phases. Prosecutors offer plea bargains if they conclude that they have "significant proof problems." At the conclusion of the hearing, the trial court stated:

> "I do not find improper motive. I do not find arbitrariness with respect to the way in which these cases that I've heard about have been handled. And I do not therefore find a basis to grant the motion to prohibit the death penalty."

The record supports the trial court's findings.

The Lane County District Attorney's policy is to charge aggravated murder when the facts of the crime fit within one or more of the statutory definitions in ORS 163.095. That policy is permissible. *See State v. Farrar*, 309 Or 132, 137-38, 786 P2d 161 (1990) (probable cause to believe that the defendant committed the crime of aggravated murder is a sufficient reason to charge that crime). On this record, we conclude that defendant has not met his burden of proving that the Lane County District Attorney's office lacked a coherent, systematic policy regarding plea negotiations in capital cases. Moreover, defendant has not alleged that he was treated disparately, nor does he contend that he was denied the opportunity to plea bargain based on class discrimination, on concerns collateral to a fair prosecution for aggravated murder, or on animus towards defendant or his attorney.

### 2. *Proportionality Review*

Defendant also contends that the trial court erred in denying his pretrial motion to compel the state to disclose on a statewide basis the cases in which a defendant had been charged with aggravated murder and was eligible for the death penalty so that the court could conduct a proportionality review. Defendant acknowledges that the issue he presents in this assignment of error was decided against him in *Cunningham*, but he contends that "this court should reexamine its holding in *Cunningham* and grant defendant relief in this case." We decline defendant's invitation to reexamine *Cunningham*.

## B. Guilt-Phase Assignments of Error

### 1. Admissibility of Death Metal Music and Satanism Evidence

In separate assignments of error, which we consider together, defendant contends that the trial court erred in overruling his objections to the introduction of evidence about death metal music and satanism, because that evidence was not relevant under OEC 401. Defendant further contends that, even if the evidence were relevant to any theory in the state's case, it was more prejudicial than probative, in violation of OEC 403, and amounted to evidence of prior bad acts, in violation of OEC 404(3).

The state responds that defendant made only sporadic objections to the introduction of evidence of death metal music and satanism, that a considerable amount of death metal music and satanism evidence was received without objection, that the evidence supported the state's theory regarding at least one of the motives for the crimes and that, in the context of other unchallenged evidence on those subjects, the evidence to which defendant objects was not unfairly prejudicial.

At trial, defendant objected to Jason Brock's description of death metal music and to Jason Brock's testimony that the lyrics in Cannibal Corpse songs "explain or picture through words killing people maybe." Defendant objected to Johl Brock's testimony that the death metal lyrics to which the group listened "described basic satanic practices, ceremonies and stuff." Defendant also objected to Johl Brock's testimony that

> "pretty much what got [Rabago and me] dabbling in satanism was the message this particular CD [by the band Deicide] gave us. I mean, looking through the lyrics and stuff. That's how we got involved in satanism."

Defendant further objected to Johl Brock's testimony that satanism is "just another religion. Just a religion that doesn't believe in the same things as Christians." Finally, defendant objected to Detective Ryan's testimony about statements

defendant made to him after defendant was arrested regarding defendant's involvement in satanism when he was 16 or 17 years of age.

■■ Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. This court has held that whether a fact or proposition is material is determined "by the pleadings and the substantive law." *State v. Clowes*, 310 Or 686, 691-92, 801 P2d 789 (1990). The state is entitled to prove a defendant's motive for a charged crime. *State v. Rose*, 311 Or 274, 283, 810 P2d 839 (1991).

■ Defendant was charged in multiple counts with "intentionally" causing Wall's death. One of the theories underlying those charges was that death metal music and satanism provided at least one of the motives for defendant, Rabago, Brumwell, and Johl Brock when they planned and committed the Dari Mart crimes. The testimony to which defendant objected was relevant to the state's theory that defendant and the others intended to commit murder, not merely robbery, when they entered the Dari Mart on the night of their crimes. The evidence also was relevant to help explain the brutality of the attacks on Wall and Ream and to explain the group's intention that Ream also die, not merely to cover up evidence of their other crimes, but also to allow them to carve satanic symbols in the bodies or to leave other blood evidence of satanism at the scene. For the forgoing reasons, we hold that the evidence was relevant under OEC 401.

■ Nonetheless, defendant contends, the evidence to which he objected was unfairly prejudicial and was "introduced to the jury to inflame them." OEC 403 provides, in part, that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." We review the trial court's decision to overrule an objection on the grounds of unfair prejudice for an abuse of discretion. *State v. Moore*, 324 Or 396, 407, 927 P2d 1073 (1996).

■ The state informed the jury during its opening statement that it would present evidence about death metal music

and satanism. The state presented such evidence, and defendant objected only to some of it. Without objection, at least two witnesses who saw defendant and the others on the day of the crimes described their black T-shirts and the markings on them, and one of those witnesses stated that his "first impression" of defendant was that he was "a Satan worshiper." As explained earlier, Rabago testified that all four men were "into evil and we were all pretty much deathers." Rabago also testified that "maybe" the group listened to death metal music before entering the Dari Mart in order to prepare themselves for the crimes and that Rabago had committed the crimes "in the essence" of, or to honor, members of the death metal bands Deicide and Cannibal Corpse. Ream testified that Brumwell emitted a "death metal growl" just before he attacked her and that the growl sounded like one she heard later on a Cannibal Corpse compact disc. Johl Brock and Rabago testified that the group discussed their plan to carve satanic symbols into the bodies of whomever they killed at the Dari Mart. In that context, the evidence to which defendant objects was not unfairly prejudicial. The trial court did not abuse its discretion in overruling defendant's motion to exclude the evidence on that ground.

Defendant also argues that the evidence regarding death metal music and satanism should have been excluded under OEC 404(3) (1993), which prohibits the introduction of evidence of "other crimes, wrongs or acts * * * to prove the character of a person in order to show that the person acted in conformity therewith."[3] According to defendant, the death metal music evidence "does not come within any of the exceptions to OEC 404(3)," and the evidence of satanism could have led the jury to convict defendant simply because he was a "bad person." The state responds that, even if OEC 404(3) applies to evidence of death metal music and satanism, the evidence was admissible to establish motive, which is one of the exceptions to an objection made under OEC 404(3).

---

[3] The 1997 Legislature amended OEC 404 by adding a new subsection that makes evidence of other crimes, wrongs or acts by a criminal defendant admissible, subject to exceptions not relevant here. Or Laws 1997, ch 313, § 29. The amendment applies to all criminal actions pending or commenced after December 5, 1996. Or Laws 1997, ch 313, § 38. Because we conclude that the trial court did not err in admitting the evidence under OEC 404(3), we need not decide the applicability of OEC 404 (1997) in this case.

■ A three-part test governs our analysis under OEC 404(3): Was the evidence independently relevant for a non-character purpose; was there sufficient proof that the conduct occurred; and did the probative value of the conduct outweigh the danger of unfair prejudice under OEC 403? *See State v. Hampton*, 317 Or 251, 254, 855 P2d 621 (1993) (identifying test).

■ Defendant's argument under OEC 404(3) *assumes* that listening to death metal music and believing in satanism are "acts" under OEC 404(3). Whether they are, for purposes of analysis under that rule, has not been briefed or argued by the parties and is not before us for decision in this case. However, even assuming, as defendant does, that listening to death metal music and believing in satanism are "acts" under OEC 404(3), we agree with the state that the trial court did not err in admitting the evidence to which defendant objects. As explained above, the evidence was relevant to the state's theory regarding defendant's motive: Wall's murder and Ream's beating were more than simply a robbery gone awry. Defendant does not dispute that the group listened to death metal music or that he made the statements to Ryan about being influenced by satanism when he was 16 or 17 years old. Also as explained above, viewed in the context of the other evidence about death metal music and satanism that was received without objection at trial, the evidence was not unfairly prejudicial.

Defendant also contends that the trial court erred in denying his motion for a mistrial. That motion was based on his contention that evidence of death metal music should not have been admitted. The state responds that defendant's motion was not timely.

■ To be preserved for appeal, a motion for mistrial must be made in a timely manner. *State v. Williams*, 322 Or 620, 631, 912 P2d 364 (1996). Assuming a proper objection, a motion for mistrial is reviewed for abuse of discretion. *Moore*, 324 Or at 425-26. Defendant did not move for a mistrial until after the state had rested its case. His motion, therefore, was not timely and hence was not preserved. *See Williams*, 322 Or at 631 (motion for mistrial "is timely if it is made when the allegedly objectionable statement was made").

For the reasons stated above, we conclude that defendant cannot prevail on these assignments of error.

## 2. *Jury Instruction on Coexisting Intents*

Defendant assigns error to the following jury instruction, which the trial court gave over his objection:

"A person often acts with two or more coexisting intents. If the state proves to your satisfaction beyond a reasonable doubt that the defendant acted with a particular criminal intent as to one count of the indictment, it is possible that you may find that the defendant had one or more other coexisting intents which were also reasons for that behavior."

At trial, defendant argued that the instruction was "a comment on the evidence and it's an inappropriate instruction[ ], something that['s] subject to argument but not to instruction."

On review, defendant contends that the instruction should not have been given, because it was a comment on the evidence, impermissibly instructed on an inference that could have been drawn against defendant from the evidence, and was "confusing and may have led the jury to conclude that the state had proven that defendant acted with criminal intent but on an improper basis." The state responds that defendant preserved only the argument that the instruction was a comment on the evidence.

■■ At trial, a party must object to a jury instruction based on a specific theory in order to preserve that argument for review. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). In this case, defendant objected at trial to the instruction only on the theory that it was a comment on the evidence. Therefore, we address only defendant's argument that the instruction on coexisting intents, which the trial court gave immediately after the instruction on intent, was a comment on the evidence.

■■ It is well established that a trial court is not permitted to comment on the evidence. ORCP 59 E; ORS 136.330(1) (ORCP 59 E is applicable in criminal cases); *Tucker*, 315 Or at 333. A court impermissibly comments on the evidence

when it gives a jury instruction that tells the jury how specific evidence relates to a particular legal issue. *Brown*, 310 Or at 373. A court also impermissibly comments on the evidence if it instructs the jury to draw an inference against the defendant that shifts the burden of proof from the state to the defendant. *State v. Nefstad*, 309 Or 523, 551-52, 789 P2d 1326 (1990); *State v. Rainey*, 298 Or 459, 464, 467, 693 P2d 635 (1985). An inference cannot relieve the state of its burden of proving each element of the crime beyond a reasonable doubt. *Rainey*, 298 Or at 464-65.

▮ The twelve-count indictment against defendant in this case alleged that he acted "intentionally" with respect to some of the crimes, "recklessly" with respect to other crimes, and "knowingly" with respect to still others. The state was required to prove each element of each crime beyond a reasonable doubt. The instruction on coexisting intents did not tell the jury how specific evidence adduced at trial related to a particular legal issue regarding any element of any crime. Neither did the instruction tell the jury that the state had proven any element of the crimes beyond a reasonable doubt. Finally, the instruction did not tell the jury that it could draw an inference against defendant that shifted the state's burden of proving criminal intent with respect to any of the crimes. The instruction merely reminded the jury that it was "possible" for it to find that defendant acted with more than one intent, as the state had alleged in the multiple-count indictment. We conclude that the trial court did not err in giving the coexisting intents jury instruction.

For the foregoing reasons, and finding no error, we affirm the judgment of conviction. We turn to defendant's assignments of error concerning the penalty phase of his trial.

## C. Penalty-Phase Assignments of Error

### 1. Victim Impact Evidence

Defendant assigns error to the trial court's denial of his motion, made at the beginning of the penalty phase, that the state not be allowed to introduce victim impact evidence. In order to address this assignment of error, we must provide

the context in which defendant and the state contest the issue.

The 1995 Legislature amended ORS 163.150(1)(a) regarding the admissibility of victim impact evidence. That section, which became effective on July 7, 1995, provides, in part:

> "In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence *including, but not limited to, victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and any aggravating or mitigating evidence relevant to the issue in paragraph (b)(D) of this subsection;* however, neither the state nor the defendant shall be allowed to introduce repetitive evidence that has previously been offered and received during the trial on the issue of guilt." (Emphasized material added by 1995 Legislature.)

The statute contemplates that evidence that may be used as victim impact evidence during the penalty phase may have been introduced for some other purpose during the guilt phase of a capital trial. *See State v. Montez*, 324 Or 343, 348-49, 927 P2d 64 (1996) (evidence from guilt phase considered in penalty phase).

Opening statements in the guilt phase of defendant's trial began on November 15, somewhat over four months after the amended version of ORS 163.150(1)(a) (1995) went into effect. During the guilt phase, the state introduced a photograph of Frances Wall that was taken while she was alive.[4] The state called David Wall as a witness in order to lay a foundation for the introduction of that photograph. Before asking him to identify the person in the photograph, the prosecutor asked David Wall if Frances Wall was his wife. Wall responded that she was. Defendant did not object to that evidence, and the court properly received it into the record.

At the beginning of the penalty phase of his trial, defendant made a general objection to the introduction of *any*

---

[4] ORS 41.415 provides:

"In a prosecution for any criminal homicide, a photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive."

victim impact evidence. He argued that, under *State v. Guzek*, 322 Or 245, 906 P2d 272 (1995), such evidence was inadmissible, because it was irrelevant. He also argued that allowing victim impact evidence pursuant to the 1995 amendment to ORS 163.150(1)(a) violated the *ex post facto* provisions of the Oregon[5] and United States Constitutions.[6] The trial court overruled defendant's objection and, during the penalty phase, David Wall testified that he and Frances Wall were the parents of two children and that Frances Wall had worked at the Dari Mart for almost five years. Wall also described telling their son that the boy's mother was dead and described the boy's reaction to that news. Apart from defendant's general objection to the introduction of victim impact evidence at the beginning of the penalty phase, he did not make a specific objection to any of Wall's testimony.

On review, defendant argues that the trial court erred in allowing David Wall to give victim impact testimony during the penalty phase pursuant to ORS 163.150(1)(a) (1995), because retroactive application of the 1995 version of ORS 163.150(1)(a) violated *ex post facto* prohibitions. The state responds that defendant failed to preserve his *ex post facto* argument, because the state introduced victim impact evidence during the guilt phase of defendant's trial. The state relies on our analysis in *Brown*:

> " 'It is well established that when evidence is offered as a whole and an objection is made to the evidence as a whole and is overruled, the trial court will ordinarily not be reversed on appeal if any portion of the offered evidence was properly admissible, despite the fact that other portions would not have been admissible had proper objections been made to such portions of the offered evidence.' *Sproul v. Fossi*, 274 Or 749, 755, 548 P2d 970 (1976) (citations omitted)."

310 Or at 359.

---

[5] Article I, section 21, of the Oregon Constitution, provides, in part:

"No *ex-post facto* law * * * shall ever be passed * * *." (Emphasis in original.)

[6] Article I, section 10, of the United States Constitution, provides, in part:

"No State shall * * * pass any * * * ex post facto Law * * *."

■ David Wall's testimony during the guilt phase of the trial—that Frances Wall was his wife—provided a foundation for his subsequent identification of a photograph of Frances Wall that was taken while she was alive. However, under ORS 163.150(1)(a) (1995), that testimony also was victim impact evidence, because it related to a personal characteristic of Frances Wall. Because David Wall's guilt-phase testimony was properly admitted victim impact evidence, the state was entitled to have the jury consider it during the penalty phase, if one occurred. When the state offered Wall's testimony that Frances Wall was his wife, defendant failed to alert the trial court, in any appropriate way that would have allowed the trial court to respond, that defendant objected to the introduction of victim impact evidence should there be a penalty phase, or that he wanted the court to limit the jury's consideration of Wall's testimony that Frances Wall was his wife. Applying *Brown* to these facts, we conclude that, when defendant asserted his objection to the introduction of victim impact evidence, the record already included such evidence and that defendant's generic objection for the first time at the beginning of the penalty phase was insufficient to preserve his *ex post facto* argument. Consequently, we do not consider the merits of that argument.

### 2. *Constitutionality of the Death Penalty*

Finally, defendant assigns error to the trial court's rejection of his contention that Oregon's statutory death-penalty scheme is unconstitutional. He concedes that his challenges have been rejected by this court in previous death-penalty appeals. That concession is well taken. *See Moore*, 324 Or at 429 n 19 (declining to discuss such challenges because it would not benefit bench or bar in light of previous holdings).

Having rejected defendant's assignments of error concerning the penalty phase of his trial, we affirm the sentence of death.

The judgment of conviction and the sentence of death are affirmed.