Submitted April 30, reversed and remanded December 12, 2012, petition for review denied July 3, 2013 (353 Or 788)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DAMON JAMES NAUDAIN,
*Defendant-Appellant.*

Multnomah County Circuit Court
080432001; A144918

292 P3d 623

Peter Gartlan, Chief Defender, and Susan Fair Drake, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Tiffany Keast, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.,**

Defendant was convicted, following a jury trial, of two counts of aggravated murder, stemming from a home-invasion robbery. On appeal, defendant raises multiple assignments of error. We write to address only defendant's contention that the trial court erred when it instructed the jury on self-defense. Defendant argues that, because he had not raised a defense of self-defense, that instruction amounted to impermissible comments on the evidence by the trial judge. We agree. Our resolution of that contention obviates our need to address defendant's remaining assignments of error, except defendant's assignment on the denial of his suppression motion, which we reject without discussion. Accordingly, we reverse and remand.

Because defendant is challenging the trial court's jury instructions, and not the sufficiency of the evidence supporting his conviction, we review all pertinent parts of the record. *See State v. Naylor*, 291 Or 191, 193-94, 629 P2d 1308 (1981); *State v. Cunningham*, 179 Or App 359, 361 n 2, 40 P3d 1065, *adh'd to on recons*, 184 Or App 292, 57 P3d 149 (2002), *rev'd and rem'd on other grounds*, 337 Or 528, 99 P3d 271 (2004), *cert den*, 544 US 931 (2005).

In 1998, defendant and five other individuals, while intoxicated on methamphetamine, drove to a home in southeast Portland to rob people of what they believed to be a significant amount of drugs and cash. While two people remained in the car, defendant and three other men approached the house, unscrewed the porch light, and gathered by the front door. The men were wearing baseball hats that said "DEA," two had security badges, and all of them but defendant had bandanas over their faces. Three of the men—including defendant—were armed with handguns and the fourth with a machete.

One of the four intruders, Jump, kicked open the front door, and all four entered the house, yelling, "police." Upon entry, the intruders split up. The man with the machete, James, ran upstairs, confronted one of the residents in a bedroom, and ordered him down the stairs. At the same time, a second intruder, Turner, confronted a woman who was asleep on a couch in the front room of the house. Turner

grabbed the woman and told her, "If you say one thing, I will peel your cap, bitch." He then dragged her up the stairs. James and Turner, with their respective hostages, met on the staircase—blocking each other's paths—where they remained for the duration of the robbery.

Meanwhile, defendant and Jump went to the bedroom where they had been told that drugs and cash would be found inside a safe. Once there, defendant and Jump encountered H, his girlfriend, and their infant son. Although there is conflicting evidence over the precise nature of the events that occurred inside the bedroom, it is undisputed that defendant shot H in the head, ordered H's girlfriend to open the safe, emptied the contents of the safe, and immediately left the house, along with his three associates. An autopsy revealed that H had died instantaneously from a gunshot wound to the temple and that the gun had been placed against H's head when it fired. A few days after the robbery, defendant moved to California with his girlfriend and began using a different last name.

In 2007, Detective McGetrick of the Portland Police Bureau Cold Case Homicide Unit began investigating H's death. By 2008, McGetrick had identified defendant as a suspect in the homicide and had learned that defendant was living in California. McGetrick eventually obtained an arrest warrant for defendant and forwarded it to the San Diego County Fugitive Task Force, which ultimately arrested defendant at his home. The day after defendant was arrested, McGetrick interviewed defendant in San Diego, and defendant confessed his involvement in the robbery and in H's death.

According to that confession, the robbery had begun to go wrong as soon as defendant entered the bedroom. Defendant explained that he had not expected there to be a woman and a child in the room, and so he was put off guard. At the same time, H was telling defendant that there were no drugs or money in the safe. As defendant was realizing that "the stuff that [he] was told was there was not there," Jump reached around defendant and punched H in the face, knocking him down. Defendant then explained:

"[Defendant:]   I was told that this individual did have a weapon, I asked him—I then pointed my weapon at him and I asked him not to move. As he was coming up from the bed on the floor, I—I basically felt that he had a weapon.

"[McGetrick:]   And why did you feel that way? Was his hand someplace out of sight, or what?

"[Defendant:]   Yes. His hand was out of sight, and I—all I can say is that I thought I saw a shine of some sort. I'm not quite sure what that shine was, but from what I was told, and because of the fact that I was also highly intoxicated with methamphetamines, that I jumped. And I've—and I—and I, between the drugs and being nervous and the information that was told to me, I panicked and I freaked out. And then the inevitable happened."

Defendant was extradited to Oregon, where he was indicted and charged with two counts of aggravated murder. Defendant pleaded not guilty and proceeded to a jury trial. He did not dispute that he had participated in the robbery or that he had shot H. Instead, the only contested issue at trial was whether defendant had intended to fire the shot.

The state presented evidence that defendant had shot H as H was reaching under the bed. McGetrick testified regarding defendant's statements to him and noted that defendant told him that he had seen H "reach under the bed, believed there to be an object in [H's] hand[,]" and "panicked." The state introduced an audio recording of McGetrick's interview with defendant in California to that effect, which contained the exchange set out above. The state also called James, who testified that, as he was making his way up the staircase with the machete, he walked by the bedroom door and saw defendant holding a gun and standing over H. James also testified that, while he was standing on the staircase with Turner and their hostages, he heard someone in the bedroom yell, "Get your hand out from under the bed," followed by "a pop, like a gunshot." Finally, the state called Guzman, who had stayed in the car during the robbery. Guzman testified that, at some point after the robbery, defendant had told her that H "went to reach under the bed to pull something out," and that defendant had shot him—though she testified that defendant did not mean to fire.

Defendant, in turn, testified that he had accidentally shot H while he was frantically looking around the room. Defendant testified that he had not felt threatened by H and that he had not seen H reach for a gun—though defendant had told H to get his hand out from underneath the bed. Defendant repeatedly emphasized that he had been highly intoxicated at the time of the robbery and described a chaotic scene: Everyone in the house was "freaking out." Defendant, H, Jump, and people outside the room were all yelling. Jump had punched H, causing him to fall to the floor. Defendant testified that he was pointing his gun at H as H was slowly getting up:

> "And I'm looking back. I'm like—I'm panicking bad. I mean, I'm—I'm freaking out. And so everyone's freaking out, but I'm not—I'm not there, like, I'm not (indiscernible) or I'm not very clear, I'm not—can't focus and so I keep looking back thinking—just so much going on * * *.

> "* * * * *

> "So I—but I'm turning, looking back—and I—so I don't know what happened. I don't know. And I shot him. Now, I—I didn't mean to."

According to defendant, he did not even remember pulling the trigger.

The state's theory of intent, set out during opening arguments, was that defendant shot H in response to a perceived threat—*viz.*, defendant believed that H was reaching for a gun. Thus, the state argued that, during his initial confession, defendant had "effectively claimed self-defense." According to the state, when defendant learned that he was not justified in employing self-defense, he shifted his story, instead claiming that the shot had been an accident. In its closing, the state reiterated that theory and highlighted the differences between defendant's initial statements to McGetrick in 2008 and his testimony at trial. The state explained that discrepancy in the context of self-defense:

> "Now, there has been some discussion about self-defense. You need to understand that under Oregon law, [defendant] had absolutely no legal right to defend himself from what he may have perceived as a potential threat from [H].

"On the other hand, [H] had every right, every legal right to defend himself and his family. He didn't. He didn't have a chance. Because this one panicked and shot.

"He now knows, [defendant], that he has absolutely no right to defend himself. So his only hope is to offer it up to you that it was an accident. In four hours of interviewing, the word accident is uttered by [defendant], count it, one time."

Defendant, for his part, emphasized that he had never raised the issue of self-defense, even during his initial interview with McGetrick. In his closing, he noted:

"And the state keeps bringing up this notion of self-defense. They mentioned it in their opening. Not one witness, nobody from the defense team and [defendant] has ever said that he was acting in self-defense. [Defendant] told you himself, I never felt threatened by [H]. I never actually saw a gun. I never actually saw a weapon.

"* * * * *

"And all this talk about get your hand out from under the bed, you'll hear his taped statement and what it says is I saw a shine of some sort. Not quite sure what that shine was, but from what I was told because of the fact that I was highly intoxicated with methamphetamines, I jumped. I jumped, is what it says. Listen to it for yourselves."

At the close of trial, the state requested a self-defense jury instruction. Defendant objected on the grounds that he had not claimed self-defense. Thus, defendant argued, the proposed self-defense instruction would be a misstatement of the law and a misapplication of the law to the facts of the case. The trial court decided, however, that a self-defense instruction was necessary to "clarif[y] that, in fact, [defendant] cannot, under these circumstances, raise self-defense."

Accordingly, the trial court gave the following instruction:

"Self-defense [is] not applicable in certain situations. Under Oregon law, a resident in a home is justified in using physical force, even deadly physical force, against an intruder when the intruder is committing a felony involving force or violence.

"Under Oregon law, an intruder who is committing or attempting to commit a felony involving force or violence in a residence is an initial aggressor. An initial aggressor cannot justify the use of physical force against another person in self-defense unless the initial aggressor first withdraws from the encounter. In the present case, [defendant] has not raised the defense of self-defense."

Defendant excepted to the instruction after the jury retired.

The jury found defendant guilty of two counts of aggravated murder. After a sentencing-phase trial, the trial court sentenced defendant to life in prison without the possibility of parole.

On appeal, defendant argues that the trial court erred by giving the self-defense instruction because that instruction constituted a comment on the evidence. In essence, defendant argues that the instruction carried a negative inference that defendant acted intentionally—*viz.*, the instruction implied that defendant acted in self-defense (an intentional action), although he was not legally justified in doing so. The state makes the cursory contention that defendant failed to preserve his argument and argues that, in any event, the instruction was not a comment on the evidence because it did not direct the jury toward any particular facts or instruct the jury to draw an impermissible inference. For the reasons discussed below, we agree with defendant.

It is well established in Oregon that a trial court is not permitted to comment on the evidence. *State v. Hayward*, 327 Or 397, 410, 963 P2d 667 (1998); ORCP 59 E ("The judge shall not instruct with respect to matters of fact, nor comment thereon."); ORS 136.330(1) (ORCP 59 E is applicable in criminal cases). A court impermissibly comments on the evidence when it instructs the jury how specific evidence relates to a particular legal issue or that it can draw an inference against the defendant that shifts the burden of proof from the state. *Hayward*, 327 Or at 410-11. We review whether a jury instruction is a comment on the evidence for legal error. *State v. Blanchard*, 165 Or App 127, 130, 995 P2d 1200, *rev den*, 331 Or 429 (2000).

Before addressing the merits of defendant's claim, we first turn to the issue of preservation. Before a criminal

defendant may seek review of an asserted trial court error in giving a jury instruction, the defendant must "identif[y] the asserted error to the trial court" and make "a notation of exception immediately after the court instruct[s] the jury." ORCP 59 H(1); ORS 136.330(2) (ORCP 59 H is applicable in criminal cases). If the defendant fails to comply with those requirements, the instruction is unreviewable, even for plain error. *See, e.g., State v. Edwards*, 251 Or App 18, 21, 281 P3d 675, *rev den*, 352 Or 665 (2012).

Here, defendant articulated his objection to the self-defense instruction as "confusing" and a "misstatement of the law"—not as an improper comment on the evidence. Nevertheless, the substance of defendant's objection fairly presented his argument on appeal. In essence, the basis for defendant's objection at trial was that the instruction impermissibly instructed the jury on how the evidence of the robbery related to the legal issue of self-defense[1] and that it implicitly instructed the jury to draw an inference against defendant that shifted the burden of proof from the state.[2]

Because defendant explained his objection to the trial court, thus giving the court the opportunity to alter or omit the instruction, and because defendant renewed his objection by excepting to it after the trial court gave the self-defense jury instruction, defendant adequately preserved his argument. *See Jett v. Ford Motor Co.*, 335 Or 493, 502-03, 72 P3d 71 (2003); *see also Delaney v. Taco Time Int'l.*, 297 Or 10, 18, 681 P2d 114 (1984) (purpose of requiring exceptions to jury instructions is to give trial court opportunity to correct instruction).

We turn to the merits. As noted, defendant argues that the self-defense instruction had the effect of informing the jury that defendant had initially claimed self-defense but that defendant could not prevail on that defense. As a result, defendant contends, the instruction implied that defendant

---

[1] As defendant explained, "I believe that when a person reads this instruction, the average person reads this instruction that whenever you see the word intruder or whenever you see the word initial aggressor, you can fill in [defendant's name]."

[2] Defendant told the court, "I think it actually relieves the State of some of their burden in this case of having to prove that it was—the element of intent, of having to do that. I think that it's confusing because we're not raising self-defense."

had acted intentionally when he shot H. In response, the state argues that the instruction had the opposite effect: it expressly set out that defendant had not raised a self-defense defense. Further, the state contends that the instruction was not a comment on the evidence because it neither expressly directed the jury toward particular facts nor instructed the jury to draw any inference—the two types of impermissible comments identified in *Hayward*. Finally, the state argues that, in any event, the instruction was harmless.

Although we do not agree with defendant's characterization of the jury instruction—specifically, the instruction did not inform the jury that defendant initially claimed self-defense, as defendant claims—the jury instruction nonetheless performed a very specific, impermissible role. As articulated by the trial court, the instruction "clarified that, in fact, [defendant] cannot, *under these circumstances*, raise self-defense." (Emphasis added.) That is to say, the instruction told the jury how specific evidence (defendant's status as an initial aggressor) relates to a particular legal issue (defendant's ability to successfully raise self-defense). As such, the instruction was impermissible. *See Hayward*, 327 Or at 410-11 ("A court impermissibly comments on the evidence when it gives a jury instruction that tells the jury how specific evidence relates to a particular legal issue."); *State v. Maciel-Cortes*, 231 Or App 302, 305, 218 P3d 900 (2009) (same).

To be sure, the jury instruction performed that role in relatively generic terms, and, as the state notes, it did not *expressly* direct the jury's attention toward any particular facts. *Cf. State v. Brown*, 310 Or 347, 372-73, 800 P2d 259 (1990) (rejecting as impermissible comments on the evidence instructions that directed the jury to consider, *inter alia*, "whether [the victim] took her purse with her," and "whether the defendant was given a key to the premises by [the victim]"); *Maciel-Cortes*, 231 Or App at 305-09 (holding that an instruction that "[d]riving under the influence of intoxicants is, itself, evidence that a person created a substantial risk of physical injury to passengers" was an impermissible comment on the evidence). That the instruction did not expressly identify particular

facts, however, has little effect on our conclusion that the instruction was improper, given its context and the trial court's purpose in giving the instruction.

That context is that, throughout trial, defendant did not dispute that he went to H's house, while armed, in order to commit a robbery. Or, articulated in the terms of the jury instruction, defendant did not dispute that he was an initial aggressor. Thus, the generic phrasing of the instruction did little, if anything, to undercut its effect: The instruction implicitly directed the jury's attention to that undisputed evidence and explained that it precluded defendant from being able to raise self-defense. As noted, that was the trial court's express purpose in giving the instruction, and it was improper. *See Hayward*, 327 Or at 410-11.

We turn, finally, to whether the jury instruction prejudiced defendant. The state argues that no reversible error occurred because, considering the jury instructions in their entirety, defendant was not prejudiced by the instruction. *See State v. Bowen*, 340 Or 487, 516, 135 P3d 272 (2006) ("[A] jury instruction does not constitute reversible error unless it prejudiced the defendant when the instructions are considered as a whole."). Under the state's view, the instruction did not prejudice defendant because the last sentence unambiguously informed the jury that defendant had not claimed self-defense. That sentence, the state argues, advised the jury to disregard any evidence relating to self-defense. Thus, because defendant sought to exclude evidence of self-defense, the state contends that the instruction was, if anything, helpful to defendant's case. We disagree.

The state is correct that the jury instruction unambiguously informed the jury that defendant *had not* raised self-defense. However, it fails to acknowledge that the challenged instruction also informed the jury that defendant *could not* raise self-defense—at least not successfully. As noted, at trial, the state heavily relied on defendant's inability to successfully raise self-defense. During its opening argument, the state suggested that defendant had shot H in response to a perceived threat but that, once he realized he could not prevail on a defense of self-defense, defendant changed his story and claimed that he had

accidentally fired the shot. The state reiterated that theory during its closing argument: "He now knows, [defendant], that he has absolutely no right to defend himself. So his only hope is to offer it up to you that it was an accident." By effectively instructing the jury that defendant was not justified in employing self-defense, the challenged jury instruction bolstered the state's argument. Accordingly, we conclude that the instruction prejudiced defendant.

Reversed and remanded.