314 February 28, 2024 No. 150

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHRISTOPHER RYAN BIGGS,
aka Chris Ryan Biggs, aka Christopher R. Biggs,
*Defendant-Appellant.*

Jackson County Circuit Court
20CR38532; A179510

Paul D. Moser, Judge.

Argued and submitted January 10, 2024.

Jamie L. Hazlett argued the cause and filed the briefs for appellant.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Defendant appeals from a judgment of conviction for reckless endangerment. He raises three assignments of error. In his first, defendant argues that the trial court erred in ruling that videos of the events underlying defendant's conviction were properly authenticated by a witness who, although he had not taken the videos, testified that the videos accurately described the events that he was present for and observed. In his second assignment of error, he argues that the trial court abused its discretion in not excluding a photograph that, in defendant's view, was not disclosed by the state. In his third and final assignment of error, he argues that the trial court erred in denying a special jury instruction to address the absence of evidence that, in his view, the state should have presented at trial. We affirm.

## I.   AUTHENTICATION UNDER OEC 901

A.   *Factual Background*

Defendant's first claim of error involves the trial court's ruling that videos of defendant's actions on the day that he was arrested were properly authenticated. The facts giving rise to that claim of error are relatively few. Defendant drove his truck to a part of Medford where several hundred protestors had gathered to protest the death of George Floyd and racial inequality. Defendant, while still in his truck, ended up in the middle of a group of protesters. He initially slowly accelerated through the crowd and then increased his speed, accelerating "rather rapidly." People present at the protest captured defendant's actions by video-taping them on their cellphones.

Before defendant's trial, he moved to exclude three cellphone videos that the state sought to introduce (each of which lasted 10-15 seconds).[1] The first video depicted the left side and front of defendant's truck and within a few feet of it. The second video depicted the right side of the front of the truck, again within a few feet. The third video appears to have been taken from a greater distance, and as the trial

---

[1] No witness provided testimony about how the state came into possession of the videos.

court described it, was similar to the first but from "a wider angle." As defendant framed the issue, the state intended to authenticate the videos not by offering the testimony of those who took the videos but rather through someone who was present at the protest. In defendant's view, showing the videos to the witness and asking that witness, "Is this how you recall the events?" did not meet the standard for authentication under OEC 901. Defendant maintained that the state would need the individuals who took the videos to testify as to their authenticity. The state responded that evidence that the "matter in question is what the proponent claims" satisfies OEC 901.

The state then offered the testimony of Davis, who was present at the protest. Davis testified that he had reviewed each of the videos and that each was a "true and accurate depiction" of what had happened when defendant drove his truck through the protestors. He testified that as to the first two videos, he was near the front of the truck depicted in the videos ("slightly right of the middle" of the front) and that he was, at least with respect to the second video, "probably very close" to whoever took the video. He explained that he did not see any differences between the videos and his recollection of events that would have made him believe that any of the videos were "edited or inaccurate or otherwise, misleading." He believed that "all three videos are of the exact same incident." Davis testified that he did not know on what device the videos had been made, who had filmed them, or how the police got them.

The court concluded that Davis's testimony that the videos were fair and accurate descriptions of what he had seen was sufficient to authenticate the videos. The court noted that Davis testified that he was close to the area depicted in the videos and that Davis had "sufficient grounds to authenticate that as being a fair and accurate representation of what happened."

Following the trial court's ruling, the state offered the three videos and Davis again testified that they accurately depicted the events that he witnessed.

B.  *The testimony that the videos were an accurate depiction of the events met the standard for authentication under OEC 901.*

On appeal, defendant contends that the trial court erred when it concluded that the state had properly authenticated the videos.

The parties agree that the question of authenticity is governed by OEC 901, which provides that a piece of evidence is authenticated "by evidence sufficient to support a finding that the matter in question is what its proponent claims." OEC 901(1). Subsection 2 then provides a nonexclusive list of "examples of authentication or identification conforming with the requirements of subsection (1)," including "[t]estimony by a witness with knowledge that a matter is what it is claimed to be." OEC 901(2)(a). The rule sets forth the "well-accepted requirement that whenever a piece of evidence is offered there must be certain minimum assurances that the evidence is what it purports to be, what it is offered as being[,] and what its value depends on." Legislative Commentary to OEC 901, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 901.02, 947 (7th ed 2023). We review a trial court's OEC 901 ruling to determine whether there was sufficient evidence for the court to have submitted the issue of authenticity to the finder of fact. *State v. Park*, 140 Or App 507, 511, 916 P2d 334, *rev den*, 323 Or 690 (1996).

We have often described the analysis under OEC 901 as embracing a "flexible" approach to authentication. *See, e.g., State v. Sassarini*, 300 Or App 106, 125-26, 452 P3d 457 (2019) (observing that "[the] more flexible approach to authentication is codified in OEC 901"). In applying that flexible approach, and in assessing whether a piece of evidence has been sufficiently authenticated, courts consider whether: (1) the recording device was "capable of taking testimony"; (2) the operator of the device was competent; (3) the recording is accurate; (4) the recording has not been changed, added to, or deleted from; (5) the recording was adequately preserved; (6) the actors or speakers can be identified; and (7) the testimony elicited was voluntarily made

without any kind of inducement. *Id.* at 124, 126 (citing *State v. Miller*, 6 Or App 366, 369-70, 487 P2d 1387 (1971)).[2]

Yet those factors are "not a catechism. To meet the *prima facie* requirements of authentication, the *Miller* factors are not 'irrelevant,' but they are also not 'rigid' or 'demanding.'" *State v. Barden*, 309 Or App 87, 93, 481 P3d 359, *rev den*, 368 Or 511 (2021). What is more, the requirements for authentication will depend on the particular circumstances and the nature of the evidence that is offered. *Sassarini*, 300 Or App at 126. As we explained in *Barden*,

> "[A]lthough the legislature intended for courts to consider these requirements, it did not intend proponents to have to satisfy each one. Rather, the traditional requirements serve as factors for a court to consider in assessing the totality of whether a proponent has made out a *prima facie* case of authenticity. The standard is not whether the proponent has conclusively proven authenticity, but rather whether the proponent has presented some 'evidence sufficient to support a finding that the matter in question is what its proponent claims' so as to admit the evidence to the jury— for the jury remains the ultimate arbiter on authenticity, veracity, and reliability of evidence."

309 Or App at 93 (quoting OEC 901(1); internal citation omitted).

With that legal framework in mind, we turn to the videos at issue here. For his part, defendant contends that Davis's testimony did not "excuse the state [from] having to introduce some evidence as to the *Miller* factors." Ultimately, defendant contends that, absent any testimony about how the videos were taken or where they came from, Davis's testimony cannot meet enough of the *Miller* factors to satisfy OEC 901. For its part, the state counters that, under the flexible approach that OEC 901 embraces, Davis's testimony that the videos accurately depicted the events and had not, in his view, been altered in any way is sufficient. Perhaps more simply framed, the parties' dispute reduces to the

---

[2] In *Sassarini*, we explained that those factors derived from *Miller*, which predated the enactment of OEC 901, but that in approving OEC 901, the legislature "intended for courts to consider" those traditional requirements. *State v. Barden*, 309 Or App 87, 92-93, 481 P3d 359 (2021) (citing *Sassarini*, 300 Or App at 126).

question whether—although the proponent of the evidence is not required to meet all of the *Miller* factors—Davis's testimony satisfies them sufficiently to allow the jury to make the ultimate determination on the videos' authenticity.

We conclude that the answer to that question, on the facts of this case, is yes. As noted above, the *Miller* factors are neither rigid nor demanding. *Sassarini*, 300 Or App at 126. Although courts are to consider the factors, they simply serve to enable a court to assess, in the totality of the circumstances, whether the proponent of the evidence has set out a *prima facie* case of authenticity. In other words, does the evidence with respect to authenticity "support a finding that the matter in question is what its proponent claims?" OEC 901(1). If so, then it is for the jury to be the "ultimate arbiter on [the evidence's] authenticity, veracity, and reliability * * *." *Barden*, 309 Or App at 93.

Evidence like Davis's testimony here—that the videos accurately and fairly depicted the events that he was a witness to, and that he saw no deletions or alterations—supports a finding that the matter in question is what the proponent (here, the state) claimed.[3] Indeed, that evidence satisfies two of the *Miller* factors. As described above, Davis testified that he was at the protests and close to defendant's truck, the subject of each of the three videos, and he saw it move as depicted in the videos. He also believed that he was likely "very close" to whoever filmed the second video. Based on his recollection of the events at the protest, particularly the movement of defendant's truck, when compared to the videos, he believed that the videos were accurate. *See Miller*, 6 Or App at 370 (one factor is whether a party has established the "authenticity and correctness of the recording"). He also testified that he did not think that any content had been edited or was inaccurate. *See id.* (another factor is whether a party can show that "changes, additions, or

---

[3] Of course, defendant can attack the weight of the evidence "by questioning foundation witnesses or by offering counterproof indicating the ways or manner in which [the evidence] is misleading or inaccurate. A significant safeguard against the deceitful use of * * * technology [such as digitalization] remains the fact that normally an authenticating witness must testify under oath that the photograph accurately represents what it purports to depict and faces potential perjury liability for falsely doing so." Laird C. Kirkpatrick, *Oregon Evidence* § 901.04, 962 (7th ed 2023).

deletions have not been made"). And in Davis's view, again as someone who was present and close to defendant's truck, each of the videos showed the "exact same incident." That evidence supports a finding under OEC 901(1) that "the matter in question is what its proponent claims."

*Miller*, in particular, informs our conclusion. There, the defendant made two tape-recorded statements. 6 Or App at 369. At trial, the state offered the recordings into evidence through an officer who was present while the statements were made and who testified that the recordings "accurately related what was said." *Id.* We rejected the defendant's argument that the recordings were not adequately authenticated. We began by noting that it "has long been established that a photograph is entitled to be received in evidence when a witness testifies that the photograph accurately depicts the object. We see no reason why the same rule should not be applied here." *Id.* at 370. We went on to conclude that the "testimony of the detective that the tapes are accurate" sufficiently authenticated them.[4] *Id.* at 370-71. So here too— Davis's testimony that the videos were accurate and had not been altered was sufficient to authenticate them.

It bears noting that because videos are becoming increasingly used in litigation, we are not the only court addressing the question of authenticity in that context. Nearly uniformly, and under rules that are similar if not identical to OEC 901, courts have concluded that testimony that a video accurately depicts an event is sufficient for authentication purposes. *See*, *e.g.*, *Keene v. Rosas*, 215 AD 3d 938, 939, 187 NYS 3d 752 (NY App Div 2023) ("It is well-settled that a video recording may be authenticated by the testimony of a witness to the recorded events * * * that the video[] accurately represents the subject matter depicted" (internal citation and quotation marks omitted)); *Mooney v. State*, No 1561-2022, 2023 WL 6783388 (Md App Oct 13, 2023) (testimony by a witness present at the event captured by video that video was a true and accurate depiction of the events was sufficient to authenticate); *Webb v. State*, 339 So 3d 118, 128 (Miss 2022) (observing, in the context of

---

[4] Indeed, the court observed that that testimony alone was "sufficient evidence for fulfillment of the first five of the seven" *Miller* factors. *Miller*, 6 Or at 371.

a photograph, that "there is no requirement that a photograph be authenticated or sponsored by the photographer" but that "any person with the requisite knowledge of the facts represented in the photograph may authenticate it"); *People v. Alston*, 169 AD 3d 1, 5, 92 NYS 3d 18 (NY App Div 2019) (cellphone recording of security footage was admissible because "an eyewitness authenticated [the recording] to the extent it depicted the relevant events"); *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F2d 966, 973-74 (2d Cir 1985) (testimony that the tape accurately depicted the events sufficient to authenticate video recording (citing FRE 901(a)).

To be sure, and as we have acknowledged, "[w]ith modern technology, particularly digitalization, it has become easier to manipulate, distort and fabricate all forms of photographic imagery. Enlargements, filtered lenses, cropping, varied focal length, and changed lighting conditions provide opportunities for manipulation which may be detectable, if at all, only by a sophisticated viewer." *Sassarini*, 300 Or App at 120 (citing Laird C. Kirkpatrick, *Oregon Evidence* § 901.04[2][e] at 956-57 (6th ed 2013)). For that reason, some have called for more stringent foundations for digital evidence. *E.g.* Kirkpatrick, *Oregon Evidence*, § 901.04 at 962 (arguing that authentication for digital images introduced as "pictorial testimony" should demonstrate the absence of enhancements and "trustworthiness" of camera's operating process (citing Witkowski, *Can Juries Really Believe What They See? New Foundational Requirements for the Authentication of Digital Images*, 10 Wash U J L & Pol'y 267 (2002).). However, as we noted in *Sassarini*, after acknowledging that reality and calls for change in the rules, our analysis "must be grounded in the Oregon Rules of Evidence." 300 Or App at 120. As explained above, Davis's testimony here satisfies the standard under those rules.

## II. ADMISSION OF PHOTOGRAPH OF DEFENDANT'S TRUCK

We turn to defendant's second claim of error. Police stopped defendant after he drove through the protest. During the encounter, an officer took photographs of the truck. One of those photographs was labeled as Exhibit 4 and showed

the back of defendant's truck. Defendant argued below that the state did not properly disclose that exhibit to him in discovery and as a result it should have been excluded at trial. The state explained that it had sent the photograph, along with other documents, to defendant's counsel and that its records showed that the exhibit had been downloaded.[5] The trial court denied defendant's motion to exclude the photograph as a discovery sanction, concluding that it was uncertain whether there had been any discovery violation and that in any event, it was unlikely that defendant would be surprised by the contents of the photograph. On appeal, defendant reprises his argument that the photograph should have been excluded as a discovery violation sanction.

We review the trial court's ruling as to a discovery violation sanction for abuse of discretion, *State v. Wesley*, 326 Or App 500, 512, 533 P3d 786, *rev den*, 371 Or 511 (2023), and affirm. To justify the sanction that defendant sought below and on appeal—exclusion—the trial court must find that defendant suffered actual prejudice and that no other sanction short of exclusion would remedy that prejudice. *State v. Moss*, 147 Or App 658, 663, 938 P2d 215, *rev den*, 325 Or 491 (1997). We agree with the court that it is unlikely that the photograph would have surprised defendant and thereby prejudiced him. *See State v. King*, 30 Or App 223, 229, 566 P2d 1204 (1977), *rev den*, 281 Or 1 (1978) (the degree of prejudice turns primarily on "the extent of surprise"). The state produced several other photographs that showed the truck—including one of the back of the truck—and defendant did not claim that those photographs were not produced in discovery. Moreover, as the state notes, other remedies short of exclusion would have been appropriate, including a short continuance to provide defendant with time to investigate the exhibit. Defendant's suggestion that the photograph "undermined the defense" and "impaired" his ability to prepare for trial, thereby necessitating exclusion of the exhibit, simply is not supported by the record. The trial court did not abuse its discretion.

---

[5] Defense counsel acknowledged having received discovery of photographs but said he was unable to open them and therefore determine whether Exhibit 4 was one of the photographs received. Defense maintained that "we simply just do not have this photo."

### III.  SPECIAL JURY INSTRUCTION

In his third assignment of error, defendant contends that the trial court erred in failing to give a variation of the less-satisfactory evidence jury instruction. Both parties and the trial court agreed on giving the uniform less-satisfactory evidence jury instruction but defendant requested that the court give an additional instruction, to which the state objected. We review for legal error, *State v. Payne*, 366 Or 588, 603, 468 P3d 445 (2020), and affirm.

The instruction related to additional photographs of defendant's truck that a responding officer took. A different officer testified at trial that the state no longer "ha[s] those pictures." The officer who took the photographs did not testify at trial, apparently as a result of the trial having been continued several times and confusion over whether the officer had been subpoenaed for the new trial dates. Based on those facts, defendant sought, and the court gave, the uniform less-satisfactory evidence jury instruction that instructed the jury that

"[t]he state has the burden to establish the guilt of the defendant beyond a reasonable doubt. When you evaluate the state's evidence, you may also consider the power of the state to gather and produce evidence. If the evidence offered by the state was weaker and less satisfactory than other stronger or more satisfactory evidence that the state could have offered, then you should view the weaker and less satisfactory evidence with distrust."

In addition to the uniform instruction, defendant sought an additional instruction:

"In this matter, you have seen evidence indicating that the police at one time possessed photographs showing the condition of [defendant's] vehicle in the immediate aftermath of the incident that occurred on or about June 1, 2020. You have also seen evidence that the police no longer possess these photographs. The police had an obligation to preserve this evidence once they obtained it, and because they failed to preserve these photographs, you are permitted to infer that these photographs would have been favorable to the defense if they had been available to present as evidence.

"Similarly, the State failed to make available for testimony a key witness in this proceeding, Officer Christine Bryant of the Medford Police Department. Officer Bryant took the above-mentioned lost photographs of [defendant's] vehicle on or about June 1st, 2020, and he would have had relevant and important testimony in this matter.

"Officer Bryant was under subpoena to appear and testify in this matter, but the State failed to make him available. Because of this failure, you are permitted to infer that Officer Bryant's testimony would have been favorable to the Defense if he had been available."

The state objected to those additional instructions, arguing that those instructions were a comment on the evidence. The trial court agreed and declined to give defendant's requested instruction beyond the uniform less-satisfactory evidence instruction.

The trial court did not err. Axiomatically, a trial court cannot "tel[l] the jury how specific evidence relates to a particular legal issue." *State v. Hayward*, 327 Or 397, 410-11, 963 P2d 667 (1998); *see also State v. Naudain*, 254 Or App 1, 10, 292 P3d 623 (2012), *rev den*, 353 Or 788 (2013) (reasoning that an instruction may not "implicitly direct[] the jury's attention" to particular evidence and suggest that the jury should draw an inference about a party's credibility or defense); ORCP 59 E ("The judge shall not instruct with respect to matters of fact, nor comment thereon."); ORS 136.330(1) (applying ORCP 59 E (to criminal trials)). Indeed, that risk is itself inherent in the less-satisfactory evidence instruction, which is why "the instruction should rarely be given." *State v. McDonnell*, 313 Or 478, 499, 837 P2d 941 (1992); *see also id.* (noting that the instruction "is perhaps as close to a comment on the evidence as any presently allowed and it is not appropriate in most cases").

The instructions that defendant sought would have instructed the jury that the evidence—the photographs and officer testimony—would have been favorable to defendant and, in the case of the officer's testimony, "relevant and important." That constitutes an impermissible comment on the evidence.

Affirmed.